REVISED SEPTEMBER 15, 1999
**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 96-30486

_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,


VERSUS


DAMON CAUSEY,

Defendant-Appellant.



_____

No. 96-31171

_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,


VERSUS


PAUL HARDY, also known as P, also known as Cool;
and LEN DAVIS,

Defendants-Appellants.



_____

Appeals from the United States District Court

August 16, 1999

Before DeMOSS, PARKER and DENNIS, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

Appellant Damon Causey appeals his convictions and resulting life sentence for violation 18 U.S.C. § 241, conspiracy against civil rights and 18 U.S.C. § 242, deprivation of rights under color of law. Appellants Paul Hardy and Len Davis appeal their respective convictions and death sentences for violation of 18 U.S.C. § 241, conspiracy against civil rights, 18 U.S.C. § 242, deprivation of rights under color of law and 18 U.S.C. § 1512(a)(1)(c), witness tampering.

We affirm Causey's convictions and sentence. We reverse Hardy and Davis's convictions for witness tampering, affirm their convictions for violation of §§ 241 and 242, vacate their death sentences and remand their cases to the district court for resentencing.

## 1. FACTS AND PROCEDURAL HISTORY

This is a direct appeal from convictions arising from the execution-style murder of Kim Marie Groves. Davis, a New Orleans police officer, targeted Groves because she filed a complaint against Davis with the Internal Affairs Division ("IAD") of the New Orleans Police Department alleging that he engaged in police brutality. Davis had a relationship with Hardy, a New Orleans drug dealer, in which Davis exchanged police protection for favors.

Davis recruited Hardy and Hardy's associate Causey to kill Groves. Davis, Hardy and Causey planned the murder and subsequent coverup. Hardy was the triggerman who killed Groves.

Davis, Hardy and Causey were charged by indictment with conspiracy to injure, oppress, threaten and intimidate Groves and another individual in the right to be free from the use of unreasonable force by one acting under color of law and in the right to provide information to law enforcement authorities about a federal crime, alleging eight overt acts in furtherance of the conspiracy (Count 1, alleging violation of 18 U.S.C. § 241); with the substantive violation of Groves' civil rights (Count 2, alleging violation of 18 U.S.C. § 242 and 2); and with killing Groves with the intent to prevent her from communicating information to a federal law enforcement officer relating to the commission of a federal offense (Count 3, alleging violation of 18 U.S.C. §§ 1512(a)(1)(C) and 2). The Government, in accordance with the Federal Death Penalty Act of 1994 (FDPA), filed a Notice of Intent to Seek the Death Penalty against Davis and Hardy. *See* 18 U.S.C. § 3593(a).

Trial began on April 8, 1996. The evidence included recorded telephone conversations among the defendants before and after the murder, during which they planned and attempted to hide their involvement with the crime. The recorded interceptions of Davis's cellular phone conversations were obtained pursuant to a court-

3

authorized investigation of a suspected drug protection racket run by Davis and other corrupt New Orleans police officers. The context of and predicate for the tapes were established by testimony from Sammie Williams, Davis's police partner who was present in the police car during many of the taped conversations. Steve Jackson, who drove the getaway car for Hardy, also testified for the Government.

On April 24, 1996, the jury returned a verdict of guilty on all three counts against Davis and Hardy. Causey was found guilty on Counts 1 and 2. The jury could not reach a verdict and the district court declared a mistrial on Count 3 as to Causey.

On April 25, 1996, sentencing hearings required by the FDPA for Davis and Hardy began in front of the same jury which had heard the guilt phase of the trial. Davis refused to participate in or attend the hearings. On the Government's suggestion, both Davis and Hardy were examined by a psychiatrist, who concluded that both were competent to proceed.

The first part of the penalty phase required the jury to make findings on intent and on the statutory aggravating factors alleged against Davis and Hardy. No new evidence was taken during this part of the hearing. The Government re-introduced all the evidence admitted during the guilt phase. The jury found that Davis intentionally participated in an act, contemplating that the life of a person would be taken or that lethal force would be used, and the victim died as a direct result of his act, pursuant to the

4

factor set out at 18 U.S.C. § 3591(a)(2)(C). The jury similarly found that Hardy intentionally killed his victim, thus satisfying the intent element described at 18 U.S.C. § 3591(a)(2)(A). The jury also found that Davis and Hardy committed the offense after substantial planning and premeditation, consistent with the statutory aggravating factor set out at 18 U.S.C. § 3592(c)(9). The jury, however, could not reach a unanimous finding as to the other statutory aggravating factor alleged against Davis and Hardy, involving pecuniary gain.

The second portion of the penalty hearing, which focused on non-statutory aggravation and mitigation, proceeded *seriatim*. On April 26, 1996, the jury returned its finding that Davis used his position as a police officer to affirmatively participate in conduct that seriously jeopardized the health and safety of other persons and that Davis posed a threat of future dangerousness to the lives and safety of other persons, recommending a sentence of death.

The second half of Hardy's penalty phase began two days later, on April 29, 1996. On May 1, 1996, the jury found the non-statutory agravators that he committed or participated in additional violent acts and that he poses a threat of future dangerousness to the lives and safety of others. Additionally, four jurors found the mitigating factor that Hardy was abandoned by his natural father and had no suitable male figure in his life; two

5

jurors found that Hardy and his family lived in an abnormally violent environment; all twelve jurors found that Hardy was abused and subjected to violence during his formative years and that he had been traumatized by the death of family members and friends. Nonetheless, the jury unanimously found beyond a reasonable doubt that the aggravating factors sufficiently outweighed any mitigation to justify a sentence of death.

Davis and Hardy were each sentenced on November 6, 1996, to concurrent death penalties as to all three counts of the third superseding indictment. On November 27, 1996, Causey was sentenced to two concurrent life terms. All three defendants filed timely notices of appeal, which are consolidated before this court.

## 2. JURY SELECTION

Causey, Hardy and Davis allege that the Government exercised its peremptory strikes in a discriminatory manner, so as to exclude African-Americans, particularly African-American females, from the jury.

All three defendants are African-American males, and the victim was an African-American female. There were seventy individuals left in the jury pool after challenges for cause. The Government was allowed 24 peremptory strikes and the defendants, collectively, 26. The Government used nine of its peremptory strikes to challenge African-American females and two to challenge African-American males. One African-American female was seated on

6

the twelve-member petit jury.  Of the four alternates selected, three were African-Americans (one male, two females) and one was a white male.

After the jury was seated, the defendants asserted claims based on *Batson v. Kentucky*, 476 U.S. 79 (1986), and its progeny. The district court held that defendants had not made out a prima facie case of discrimination, but nonetheless instructed the Government to articulate a race-neutral reason for each of the challenged strikes.  Thereafter, the district court held that the Government's reasons were race-neutral, and denied defendants' *Batson* challenges.

"When the record contains an explanation for the government's peremptory challenges, this Court will review 'only the propriety of the ultimate finding of discrimination.'" *United States v. Perkins*, 105 F.3d 976, 978 (5th Cir. 1997)(quoting *United States v. Forbes*, 816 F.2d 1006, 1010 (5th Cir. 1987)).  Moreover, the district court's decision on the ultimate question of discrimination is a fact finding, which is accorded great deference.  *Id.*

Hardy concedes that the Government's articulated reasons were race-neutral and that the *Batson* challenges are without merit under Fifth Circuit precedent.  However, he contends that our standard of review is too deferential and objects to the use of subjective factors when exercising peremptory strikes.  This panel is bound by

7

the circuit precedent and Hardy's criticisms of it avail him nothing.

Davis alleges that the Government selectively questioned African-American jurors about their religious views and used their responses as the basis of strikes; that the Government struck African-Americans for reasons that applied to white jurors who were not struck; and that the Government's articulated reasons were "non-quantifiable." Causey complains that the Government's articulated reasons were not credible, not quantifiable and internally inconsistent. Further, Causey characterizes the Government's jury selection as focused on eliminating African-American women due to the erroneous and racist view that they would be more likely to acquit African-American males, based on the fact that the jury that acquitted O.J. Simpson included nine African-American females.

Unless a discriminatory intent is inherent in the prosecutor's explanations, the reasons offered will be deemed race-neutral. *See Purkett v. Elem*, 514 U.S. 765, 768 (1995). The Government's explanations were race-neutral and not outside the realm of credibility. Under the "great deference" standard of review, we affirm the district court's assessment of the Government's explanations for the exercise of its peremptory strikes. *See United States v. Perkins*, 105 F.3d 976, 979 (5th Cir. 1997).

### 3. UNDER "COLOR OF LAW"

Defendants were all convicted for violations of 18 U.S.C. § 241 (conspiracy against rights) and § 242 (deprivation of rights under color of law). Section 241 provides, in relevant part:

> If two or more persons conspire to injure, oppress, threaten, or intimidate any person in . . . the free exercise of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having exercised the same . . .
>
> They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section . . . they shall be fined under this title and imprisoned for any term of years, or for life, or may be sentenced to death.

18 U.S.C. § 241. Section 242 provides, in relevant part:

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person . . . to the deprivation of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both . . . and if death results from the acts committed in violation of this section . . . shall be fined under this title, or imprisoned for any term of years or for life, or may be sentenced to death.

18 U.S.C. § 242. While § 242 contains an express requirement that the deprivation be "under color of law," § 241 does not. However, § 241 has been construed to require state action. *See, e.g., United States v. Tarpley*, 945 F.2d 806, 808 & n.2 (5th Cir. 1991).

Causey, Davis and Hardy challenge their convictions on Counts 1 and 2, alleging that they were not supported by sufficient evidence that the defendants acted under "color of law." The

verdicts must be sustained unless a reasonable trier of fact could not have found the "color of law" element beyond a reasonable doubt. *United States v. Williams*, 132 F.3d 1055, 1059 (5th Cir. 1998).

Defendants argue that the offense did not have its genesis in Davis's police duties. They point out that the evidence established that Groves's IAD complaint against Davis was unfounded and that Davis was angry that she lied about him. Davis then called on his friend Hardy to vindicate his anger. Defendants note that they were "totally surreptitious" in using the police vehicle and Davis's status as a police officer to commit the crime. They characterize the murder as "personal" as opposed to "official" and therefore contend that the crimes were not committed under "color of law."

The statutes in question are Reconstruction Era civil rights statutes making it criminal to deprive a person of rights protected by the Constitution or laws of the United States under color of law. *See United States v. Price*, 383 U.S. 787, 801-806 (1966)(setting out the origins of statutes and their history from 1866 through 1966). Consequently, we have ample guidance from the Supreme Court concerning the proper interpretation of the phrase "color of law." In *United States v Classic*, 313 U.S. 299 (1941), the Supreme Court found that state election officials who altered ballots were acting under color of state law, because

> the alleged acts of appellees were committed in the course of their performance of duties under the Louisiana statute requiring them to count the ballots, to record the result of the count, and to certify the result of the election. Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken "under color of" state law.

*Classic*, 313 U.S. at 325-26. In *Screws v. United States*, 325 U.S. 91 (1945), which involved the beating death of a man by some law enforcement officers, the Supreme Court again found action under color of law, because the defendants had

> [a]cted under "color" of law in making the arrest of [the victim] and in assaulting him. They were officers of the law who made the arrest. By their own admissions they assaulted [the victim] in order to protect themselves and to keep their prisoner from escaping. It was their duty under Georgia law to make the arrest effective. Hence, their conduct comes within the statute.

*Screws*, 325 U.S. at 107-8. The Supreme Court held that "acts of officers who undertake to perform their official duties are included [within the definition of 'under color of law'], whether they hew to the line of their authority or overstep it." *Id.* at 111. However, the "acts of officers in the ambit of their personal pursuits are plainly excluded." *Id.* In *Griffin v. Maryland*, 378 U.S. 130 (1964), the Supreme Court further explained that "[i]f an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity." *Id.* at 135.

In *United States v. Price*, 383 U.S. 787 (1966), a deputy

11

sheriff in Mississippi released three prisoners in the middle of the night, then proceeded to follow them and intercept them. He removed them from their car and placed them in his official car and took them to a deserted location, where they were met by two other policemen and fifteen private individuals, who, acting together, killed the three victims. The Court found that all the defendants, including the private citizens, were acting under color of law because

> the brutal joint adventure was made possible by state detention and calculated release of the prisoners by an officer of the State. This action, clearly attributable to the State, was part of the monstrous design described by the indictment. State officers participated in every phase of the alleged venture: the release from jail, the interception, assault and murder.

*Price*, 383 U.S. at 795.

In *United States v. Tarpley*, 945 F.2d 806 (5th Cir. 1991), this court held that a deputy sheriff was acting under color of law when he assaulted his wife's former lover out of personal jealousy in the defendant's home. The Court explained, the "air of official authority pervaded the entire incident" because the defendant used his service revolver, summoned fellow officers from the sheriff's station to help him, claimed to have special authority as a police officer, and ran the victim out of town in a squad car. *Id.* at 809.

In determining whether sufficient evidence supported the "under color of law" element of the convictions, we are called on

12

to determine, first, whether Davis misused or abused his official power, *see West v. Atkins,* 487 U.S. 42, 50 (1988)[1], second, whether there is a nexus between the victim, the improper conduct and Davis's performance of official duties, *see Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452 n.4 (5th Cir. 1994)(en banc), and third, whether Hardy and Causey jointly engaged with Davis in the prohibited action. *See Price*, 383 U.S. at 795.

The jury heard evidence that Davis misused or abused his official authority in planning, carrying out and covering up the murder. On October 13, 1994, Davis, along with his police partner Sammie Williams, who testified for the Government, began their shift around 2:30 p.m. During that shift, Davis paged Hardy and Causey, discussed with them his plan to have Groves killed, met with them in the police station, then took them in his police car to show them the area that Groves frequented. The jury heard Davis's voice on tape telling Williams, "I could get 'P' to come do

---

[1]Defendants point out that appellate decisions affirming civil verdicts for money damages under 42 U.S.C. § 1983 are distinguishable because the evidence need only support a finding by a preponderance of the evidence rather than the more stringent beyond a reasonable doubt criminal standard applicable in this matter. Keeping in mind that distinction, we nonetheless find analysis concerning the meaning of "under color of law" language in § 1983 instructive in the proper interpretation of the same language used in §§ 241 & 242. *See West v. Atkins*, 487 U.S. 42, 49 (1988)(noting that the traditional definition of acting under color of law articulated in *Classic* had been adopted for purposes of § 1983 analysis).

13

that 'hoe now.  And then we handle the thirty."[2]  Williams testified that the statement meant that Davis would get Hardy would kill Groves, then Davis and Williams would respond to the murder scene and "handle" any evidence that might link Hardy to the crime. Later in the shift, while patrolling in the police car, Davis spotted Groves and paged Hardy to give him Groves's location. Hardy killed Groves shortly after Davis went off duty and Davis used his police radio to confirm the hit with the police officer at the murder scene.  We conclude that this evidence is sufficient to support a finding that Davis misused or abused his official power to access the police station, the police car, and police radio to plan, execute, and cover up the murder.  The evidence of a nexus between that abuse and the crime is likewise sufficient.  Davis's status as a police officer put him in the unique position to "handle the thirty" and thus offer protection to Hardy from the consequences of the murder.  The motive for the crime arose from a complaint lodged by Groves against Davis in his official capacity, it was facilitated by the ability of Davis to case the area in his police car without arousing suspicion and to offer assurance of police protection to his accomplices.  Finally, there is ample evidence that Hardy and Causey jointly engaged with Davis in these prohibited actions.  Therefore, the Appellants' challenges to the

---

[2] "Thirty," is New Orleans Police jargon for homicide, corresponding to the Louisiana Criminal Code definition of first degree murder, at LSA-R.S. 14:30.

14

sufficiency of the evidence on the "color of law" element fail.

## 4. REFUSAL TO SEVER FOR SEPARATE GUILT PHASE TRIALS

Causey and Hardy argue that their cases should have been severed from Davis' case for the guilt phase of the trial. Both filed motions for severance, and have therefore preserved error on this issue.

There is a strong preference for trying defendants who are indicted together in joint trials. *See Zafiro v. United States*, 113 S. Ct. 933, 937 (1993). Severance should generally be granted only when there "is a serious risk that a joint trial would compromise a specific trial right of a properly joined defendant or prevent the jury from making a reliable judgment about guilt or innocence." *Id*. at 938. The defendant seeking severance must demonstrate a "specific and compelling prejudice that resulted in an unfair trial and such prejudice must be of a type against which the trial court was unable to afford protection." *United States v. Pena Rodriguez*, 110 F.3d 1120, 1128 (5th Cir.), *cert. denied*, 118 S. Ct. 71 (1997). The denial of severance is reviewed for abuse of discretion. *See United States v. Mulderig*, 120 F.3d 534, 542 (5th Cir. 1997), *cert. denied*, 118 S.Ct. 1510 (1998).

Hardy claims he was prejudiced by spillover evidence that was not relevant to his prosecution. Specifically, Hardy claims he was prejudiced by evidence relating to the federal investigation of public corruption, which involved Davis's agreement to protect drug

15

shipments for an undercover FBI agent posing as a major drug importer. Although the district court expressly excluded any evidence relating to the investigation, Hardy maintains that it nonetheless made its way into evidence and deprived him of a fair trial.

Hardy claims that Government witnesses were required to make references to "unrelated matters," which could only refer to the federal investigation. In addition, Davis' partner, Sammie Williams testified that Williams and Davis became partners because "it would be more convenient for us to be partners, given the other things we were involved in." Finally, Williams described at trial how Williams and Davis split $16,000 cash on the day Groves was murdered. Hardy claims that this evidence indicated that Davis was involved in drugs and that Hardy was part of the operation. Thus, the jury may have concluded that Davis and Hardy were involved in illegal operations and that Hardy killed Groves to placate Davis. That inference appears to be true. Stated differently, the record is replete with evidence that Davis and Hardy were engaged in illegal activities and that Hardy murdered Groves to placate Davis and ensure continuing police protection for his drug trafficking and related violent offenses. Indeed, that was the Government's

16

primary theory at trial. Evidence directly tied to the Government's theory on motive is relevant and admissible against Hardy. With regard to evidence of the "unrelated" federal investigation, Hardy concedes there was no specific reference to that investigation in the guilt phase of the trial. In addition, the district court gave cautionary instructions requiring the jury to consider the evidence against each defendant individually, and not to "think of them as a group." The district court's refusal to sever as to Hardy was not an abuse of discretion.

Causey sought severance from both Davis and Hardy, arguing that he would be prejudiced by the conduct of his more culpable co-defendants, and that the non-capital character of his prosecution set him apart from the other defendants. The district court held that Causey's role as Hardy's "right-hand man" made Causey an integral part of the charged conspiracy. The district court also held that Causey had not demonstrated that any compelling prejudice would result as a consequence of the non-capital character of his prosecution.

Causey's first argument, that he was prejudiced by evidence of Hardy and Davis's drug relationship is unavailing. As with Hardy, there was sufficient evidence tying Causey to Davis's illegal activities to support the district court's refusal to sever. Causey also complains that his position on particular members of the venire panel and with respect to certain trial decisions was given less weight because of the non-capital nature of his

prosecution.  Causey claims that many of the African-American jurors excluded because of their views on the death penalty would have been acceptable to him.  Causey further claims that he was deprived of his rights under the equal protection clause as a result of his joint trial with capital defendants.

The Supreme Court has rejected the argument that a non-capital defendant cannot receive a fair trial when tried jointly with capital defendants.  *See Buchanan v. Kentucky*, 483 U.S. 402, 418-419 (1987).  Thus, Causey's claim is not one of per se error.  We perceive no compromise of any specific trial right nor any danger that the jury was prevented from reaching a reliable verdict in Causey's case.  We therefore hold that the district court did not abuse its discretion in denying Causey's motion for severance.

### 5. PROSECUTORIAL MISCONDUCT

Davis maintains his right to a fair trial was substantially affected by the prosecutor's improper remarks in closing argument.  Improper comments by the prosecutor may constitute reversible error when the defendant's right to a fair trial is substantially affected.  *United States v. Anchondo-Sandoval*, 910 F.2d 1234, 1237 (5th Cir. 1990).  Whether such error requires reversal depends upon the magnitude of the prejudicial effect, the efficacy of any cautionary instruction and the strength of the evidence of the defendant's guilt.  *United States v. Murrah*, 888 F.2d 24, 28 (5th Cir. 1989).

18

Steve Jackson testified at trial that he drove his light blue Maxima to the murder scene. At trial, there was conflicting evidence concerning whether the getaway car observed leaving after the murder was champagne or light blue. Davis claims the prosecutor improperly offered the prosecutor's own testimony on this issue by stating:

> Well, I have a champagne-colored vehicle, which is metallic beige, and in certain lighting conditions at night, it looks like light blue. Trust me. The lights are not very good in that poor Ninth Ward neighborhood.

Davis lodged an objection to this argument, but the district court continued without issuing a cautionary instruction.

Another issue at trial related to the police 911 tapes recorded on the night of the murder, which had inadvertently been recorded over by New Orleans Police. Defense counsel argued there was something suspicious about the absence of the 911 tapes. The prosecutor responded in argument by stating:

> There was nothing on that 911 tape that would take away the force of what you heard. It's a smokescreen.

Davis also objects to unflattering characterizations of the defendants by the prosecutor. The prosecutor called Hardy "an animal of the street." The prosecutor referred to Davis as "a street killer, a ruthless person." Davis also objects to the prosecutor's statements about the O.J. case:

> You can forget about that conspiracy theory. That may fly on the west coast, it's not going to fly here, because it makes no sense.

19

Davis also objects to the following remark made in rebuttal:

> [B]ut what happened on that day to that poor woman, a citizen of the United States, should not have happened in this country. Maybe somewhere else not in the United States. Because what the evidence showed what we proved to you through the very voices of those defendants was the existence of a police death squad in New Orleans, Louisiana, in the state of Louisiana.

Finally, Davis objects to the following argument made in closing:

> [T]oday we are in a court of law in the United States of America, the finest judicial system in the world. It's time for justice. It's time to stop the killing, stop the carnage. There's only one way to get justice in the case, ladies and gentlemen, and that's to bring back a verdict of guilty on each and every one of these gentlemen.

Davis did not lodge contemporaneous objections to any of the remarks except those relating to the color of the getaway car. This Court's review of the latter remarks is therefore for plain error only.

After reviewing the record, we conclude that any error in the prosecutor's closing argument does not require reversal due to the overwhelming evidence of Davis's guilt and the negligible prejudicial affect of the remarks in the context of this case. *See Murrah*, 888 F.2d at 28.

### 6. EVIDENTIARY RULINGS

#### 6a. "Other offense" evidence

Davis and Hardy challenge the admission of Steve Jackson's testimony that defendant Hardy committed other murders, that Hardy was a drug dealer, and that Hardy possessed many guns. Davis and

20

Causey challenge the admission of Jackson's testimony that defendant Causey was "in the game," and Jackson's explanation that "in the game" meant selling drugs, robbing, and killing people. Davis also challenges the admission of Williams's testimony, which may have allowed the jury to deduce that Davis and Williams were in the drug business together.

Appellants argue that the introduction of these items was (1) extrinsic evidence of other offenses, (2) probative only of the defendants' bad character, (3) irrelevant to any element of the offenses, and (4) highly prejudicial. Federal Rule of Evidence 404(b) prohibits the admission of "other crimes wrongs or acts . . . to prove the character of a person in order to show action in conformity therewith." However, such proof is admissible to establish motive, opportunity, intent, preparation, plan or knowledge. *See* FED.R.EVID. 404(b).

During cross-examination of Jackson, defense counsel asked whether defendant Hardy was a friend of Jackson's. Jackson replied:

> I'm a friend of his, but he's not to be trusted. He done killed seven people from the neighborhood, seven neighbors, then killed another in the neighborhood.

The district court admonished the witness to answer the questions and to testify from his own knowledge, not what he knows from someone else. Davis claims Jackson's comment was non-responsive and highly prejudicial.

21

Jackson also testified that he had seen Davis and Hardy together in the presence of guns and drugs, that Causey was "in the game" and that "in the game" meant that Causey was involved in dealing drugs, robbing and killing people. Williams testified that Davis had told Williams that Hardy was a drug dealer who "looked out for" Davis and that he had heard Steve Jackson was a member of Hardy's drug dealing "crew."

The Government introduced evidence of other firearms belonging to Hardy that were seized as the result of various search warrants. Davis argues that Davis's and Hardy's mutual involvement in drugs and guns is immaterial to this case. Similarly, he argues that no weapon other than the murder weapon was relevant to the Government's case.

With regard to Davis's and Hardy's drug and weapon affiliation, the district court ruled prior to trial that Davis's and Hardy's joint drug activities were relevant to establish why Davis would solicit Hardy to commit the murder.

With regard to evidence of other weapons, the district court ruled that such evidence was admissible to prove Hardy's facility with and access to weapons and Hardy's practice of scattering his weapons among his cohorts, which tended to support the Government's evidence that Hardy retrieved a gun from Causey prior to the murder.

Evidence that Davis and Hardy were in involved in illegal activities that included violent crimes and drug dealing was

22

relevant to prove both opportunity and motive under the Government's theory of the case, which was that Hardy was willing to execute Groves and Davis was able to order that execution, because of their mutual involvement in these activities, and because of Davis's status as a police officer. Causey was alleged to be Hardy's right hand man. Jackson's testimony that Causey was "in the game" was likewise relevant to motive and opportunity.

Davis also challenges the admission of FBI Agent Stanley Hadden's testimony, which twice referred to an "unrelated investigation" of public corruption that involved obtaining taps on the cellular phones of Davis and his partner Sammie Williams.

The district court excluded the details of the federal investigation into Davis's drug trafficking operations as irrelevant to the issues to be proven at trial. Nonetheless, FBI agent Stanley Hadden testified that the taped telephone conversations were obtained as the result of an "unrelated" federal investigation. Defendants claim they suffered unfair prejudice requiring a new trial as a result.

This testimony was presented to authenticate the tapes, which were properly admitted. Any resulting prejudice from the non-specific references to the federal investigation complained of by defendants was insufficient to warrant reversal.

Defendants are not entitled to relief on this ground of error.

**6b. The gun barrel**

23

Defendants complain that admission into evidence of the gun barrel recovered from the Industrial Canal was error.

At trial, Steve Jackson, driver of the getaway car, testified that Hardy threw the barrel of the murder weapon out the window of the car and into the Industrial Canal near the Florida Avenue Bridge.

Jackson did not tell the Government about the barrel being removed and thrown off the bridge until almost one year after he was originally questioned.[3] Shortly after Jackson told the Government, a Government diver recovered a barrel compatible with the 9mm weapon recovered from Causey's house and believed to be the murder weapon. Defendants argue that the barrel was not properly authenticated. Defendants note that the barrel was too corroded to be attached to the alleged murder weapon and that tests on the alleged murder weapon were inconclusive.

The evidence is sufficient to support an inference that the recovered barrel was on the murder weapon when it was used to kill Kim Groves. At trial, a firearms expert testified that the barrel was compatible with the alleged murder weapon. An FBI expert also testified that the level of corrosion on the barrel was consistent with it being in the water for thirteen months, the period of time

---

[3] Defendants claim that Jackson had an incentive to lie to help himself on pending charges in another matter. The district court correctly found that this point goes to weight rather than admissibility.

between the murder and its recovery.[4] Further, the barrel and the circumstances of its recovery support Jackson's testimony about the events of the crime. *See United States v. Ramey*, 414 F.2d 792, 794 (5th Cir. 1969)(relying on facts surrounding the discovery of a pistol to support an inference that it was used to perpetrate the robbery at issue in that case).

Defendants are not entitled to relief on this ground.

## 6c. "Rock-a-bye, baby" stipulation

Causey complains that the district court accepted a stipulation by the Government and defendants Davis and Hardy that "rock-a-bye, baby" was a slang expression understood to refer to killing someone, as in "it will be rock-a-bye, baby for you." The expression was drawn from the movie "New Jack City." In that movie, a female drug dealer used the expression before shooting people.

Causey objected that the stipulation was over broad and should be changed to reflect that "rock-a-bye, baby" refers to the killing of a drug dealer. The district court overruled Causey's objection and accepted the stipulation on the basis that Davis and Hardy were the only ones who used the expression in the relevant telephone conversations.

Davis used the expression "rock-a-bye" when gleefully

---

[4] The expert testified that the barrel could have been in the water for anywhere from 6 months to 2 years.

25

confirming with Hardy that Groves was dead. Davis said, "Yeah, yeah, yeah, rock, rock-a-bye." Davis also used the phrase to tell Hardy that if Nathan Norwood followed up on the IAD complaint against Davis, it would be "rock-a-bye, baby" for him.

The district court's decision to accept a stipulation from Davis and Hardy, to the exclusion of Causey, as to the meaning of the phrase "rock-a-bye," baby" was not error. Causey is not entitled to relief on this ground.

### 7. CAUSEY'S SENTENCING

Causey argues that the district court misapplied the sentencing guidelines by calculating his sentence using murder as the underlying offense notwithstanding the fact that he was not convicted on Count 3, which alleged witness tampering accomplished by the murder of Groves. We review the district court's legal interpretation and application of the sentencing guidelines *de novo*, and its factual findings in support of the sentence for clear error. *United States v. Parker*, 133 F.3d 322, 329 (5th Cir. 1998).

Causey's sentence was calculated using U.S.S.G. §2H1.1, which is the appropriate guideline for Causey's convictions under 18 U.S.C. §§ 241 and 242. Under § 2H1.1, the base offense level is the *greatest* of (1) the offense level applicable to any underlying offense, or (2) 12, 10 or 6, depending upon the circumstances of the offense. The PSR derived the base offense level from U.S.S.G. § 2A1.1(a), the guideline applicable to First Degree premeditated

murder. That guideline provides a base offense level of 43, which requires a mandatory term of life imprisonment. *See also* U.S.S.G. § 2X1.1 (establishing the base offense level for conspiracy as that of the substantive offense). Causey objected that he had not been convicted of murder, but the district court adopted the PSR and sentenced Causey accordingly.

Application note 1 to §2H1.1 provides that "offense level applicable to any underlying offense" means "the offense guideline applicable to any *conduct established by the offense of conviction* that constitutes an offense under federal, state, or local law." (emphasis added). The conduct established by the offenses of conviction -- conspiring to murder and participating in the murder of Groves -- was appropriately employed by the district court in determining Causey's base offense level of 43. *See United States v. Woodlee*, 136 F.3d 1399 (10th Cir. 1998). The jury's failure to reach a verdict on Count 3 has no bearing on this determination. Causey mischaracterizes Count 3 as the "murder" count and as the "underlying offense" count. In fact, Count 3 was the witness tampering count, while Counts 1 and 2 charged violation of civil rights under color of law. All three Counts involved the underlying offense of murder. We therefore affirm the district court's application of the sentencing guidelines to Causey.

### 8. TAMPERING WITH A WITNESS

Davis and Hardy were convicted on Count 3 for violation of 18

U.S.C. § 1512(a)(1)(C), which provides, in pertinent part:

> Whoever kills or attempts to kill another person, with intent to --
> (C) prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense . . . shall be punished as provided in paragraph (2).
>
> (2) The punishment for an offense under this subsection is --
> (a) in the case of murder . . . the death penalty or imprisonment for life . . . .

18 U.S.C. § 1512(a)(1)(C) & (a)(2)(A).  "Law enforcement officer" as used in § 1512 "means an officer or employee of the Federal Government, or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant . . . authorized under law to engage in or supervise the prevention, detection, investigation, or prosecution of an offense."  18 U.S.C. § 1515(a)(4).  However, § 1512 also provides:

> In a prosecution under this section, no state of mind need be proved with respect to the circumstance . . . that the judge is a judge of the United States, or that the law enforcement officer is an officer or employee of the Federal Government, or a person authorized to act for or on behalf of the Federal Government, or serving the Federal Government as a adviser or consultant.

18 U.S.C. § 1512(f)(2).

Defendants Davis and Hardy argue that the evidence is insufficient to support their convictions on Count 3 of the indictment because the Government failed to prove the required federal nexus of potential communication.  Defendants argue that conviction under § 1512(a)(1)(C) requires proof of the following

28

elements: (1) that defendant killed a person; (2) that defendant was motivated by a desire to prevent communication between any person and law enforcement authorities about the commission of an offense; (3) that the offense was, in fact, a federal offense; and (4) that the defendant *believed* the person might communicate with federal authorities.

Based on the plain language of § 1512(f)(2), the fourth element identified by defendants is incorrect -- there is no requirement that the Government prove that the defendants believed the law enforcement officials to be federal. Further, defendants' argument that Williams, rather than Davis, committed the act of police brutality alleged by Groves's complaint is irrelevant. Prosecution under § 1512 is not limited to defendants who are guilty of the underlying federal offense which the victim reported or was expected to report.

Further, defendants argue that Groves's internal complaint to local police had not been reported to federal law enforcement and was not yet a ripe civil rights complaint as the Government characterized it. However, this lack of "ripeness" is not controlling. "An official proceeding need not be pending or about to be instituted at the time of the offense." 18 U.S.C. § 1512(e)(1); *see also United States v. Galvan*, 949 F.2d 777, 783 (5th Cir. 1991)(fact that Government informer was no longer communicating with the Government at time of offense did not render

29

prosecution under § 1512(a)(1)(C) inappropriate). Nonetheless, we are convinced that the evidence was not sufficient to establish the federal nexus required by § 1512.

The evidence was clearly sufficient to allow the jury to conclude (1) that defendants killed Groves; (2) that defendants were motivated by a desire to prevent communication between Groves and law enforcement authorities about the alleged police brutality offense; and (3) that the offense which was the subject of Groves's complaint -- a civil rights violation -- could, in fact, be charged as a federal offense.

What remains is to determine what conclusions the evidence will support concerning whether the communication defendants sought to prevent would in fact be to **federal** law enforcement officers. This circuit has not previously addressed an analogous situation. However, the Third Circuit in *United States v. Bell*, 113 F.3d 1345 (3rd Cir. 1997), has considered this issue, stating:

> In view of the statute's clear command that the government need not prove any "state of mind" on the part of the defendant with respect to the federal character of the proceeding or officer, 18 U.S.C. § 1512(f), we do not read [the statute] as requiring proof that the defendant believed the victim might communicate with law enforcement officers <u>whom the defendant knew or believed to be federal officers.</u> Rather, we read this sentence as recognizing that what the statute mandates is proof that the officers with whom the defendant believed the victim might communicate <u>would in fact be federal officers</u>.

*Bell*, 113 F.3d at 1349 (emphasis added). This element "may be inferred by the jury from the fact that the offense was federal in

nature, plus appropriate evidence." *Id.* at 1349.

The Eleventh Circuit, interpreting the similarly worded § 1512(b)(3)[5] has held, "all that was required [to establish a] . . . violation of § 1512(b)(3) was the possibility or likelihood that [the defendants'] false and misleading information would be transferred to federal authorities irrespective of the governmental authority represented by the initial investigators." United States v. Veal, 153 F.3d 1233, 1251-52 (5th Cir. 1998). The Eleventh Circuit cited United States v. Galvan, 949 F.2d 777, 783 (5th Cir. 1991)("[T]he statute focuses on the defendant's intent: whether she thought she might be preventing [the witness's] future communication of information"), from this court, as well as other Circuits' interpretations of § 1512(a)(1)(C), as authority for their interpretation of § 1512(b)(3). We do not find the Eleventh Circuit's reasoning persuasive in resolving the question before us

---

[5]18 U.S.C. § 1512(b)(3) provides:

(b) Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to –

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;

shall be fined under this title or imprisoned not more than ten years, or both.

in this case.  Rather, as dictated by *Galvan*, we parse the record focusing on the defendants' intent.

The evidence reveals that Davis's specific intent was to short-circuit the IAD investigation and to send the IAD a message to leave him alone in his misuse of police power.  There is no evidence that the likelihood or possibility that the murder might impact a future federal investigation played a part in this crime. The evidence was sufficient to establish that Groves's police brutality complaint concerned a federal crime and that the defendants intended to interfere with Groves's pursuit of that complaint.  However, prior to her death, the only agency to which Groves had complained was the New Orleans Police Department.  There is nothing in this record which would support a jury finding that any of the persons to whom Groves complained were federal officers. Likewise, there is nothing in this record which would support a jury finding that Groves had any intention of communicating with any federal law enforcement officer prior to her death.  Finally, there is no evidence in the record that would support an inference that Davis intended to prevent Groves from pursuing her complaint beyond the New Orleans Police Department IAD and communicating with authorities who were in fact federal officers.  We therefore reverse Hardy's and Davis's convictions on Count 3.

### 9. CAPITAL SENTENCING ISSUES - DAVIS AND HARDY

Davis and Hardy were sentenced to death pursuant to the

provisions of the Federal Death Penalty Act of 1994, 18 U.S.C. §§ 3591 – 3597 (FDPA). The Government provided notice of its intent to seek the death penalty, and notice of the aggravating factors upon which it intended to rely, as required in § 3593(a).

The jury did not make separate recommendations concerning the appropriate penalties for each count of conviction. Because it is impossible to say that the jury's penalty phase recommendations of the death penalty were not influenced by the fact that Davis and Hardy had received three death eligible convictions, rather than two, we must vacate the death sentences and remand for new sentencing hearings pursuant to 18 U.S.C. § 3593(b)(2)(D)(providing that the penalty phase be conducted before a jury impaneled specifically for the purpose of the sentencing hearing if, after initial imposition of a sentence, reconsideration of the sentence is necessary). Our remand of Hardy's and Davis's cases for a new sentencing hearing moots the remaining issues raised in their appeals alleging error in their initial penalty phase proceedings.

### 10. CONCLUSION

For the foregoing reasons, we affirm Causey's convictions and sentences; affirm Hardy's and Davis's convictions as to Counts 1 and 2; reverse Hardy's and Davis's convictions as to Count 3; vacate Hardy's and Davis's death sentences; and remand Hardy's and Davis's cases for resentencing.

AFFIRMED in part, REVERSED in part, VACATED AND REMANDED in

33

part.

ENDRECORD

DeMOSS, Circuit Judge, concurring in part and dissenting in part:

I wholeheartedly concur in the majority's conclusion that the evidence was insufficient to establish the federal nexus required to support Davis' and Hardy's convictions on count 3, which alleges tampering with a witness in order to prevent communication with a federal law enforcement officer. I also concur with the majority's determination that Davis' and Hardy's death sentences must be set aside and a new penalty hearing conducted because it is not possible to separate the jury's death penalty determination as to the various counts in the indictment. Finally, I concur with the majority's treatment of various other issues in parts 2, 5, 6 and 7 of the majority opinion.

I disagree, however, and therefore must dissent from the majority's decision to affirm Davis' and Hardy's convictions on counts 1 and 2, which alleges conspiracy to deprive and deprivation of Kim Groves' civil rights in violation of 18 U.S.C. § 241 and § 242, on the theory that those defendants' actions against Groves constituted conduct under color of state law. I also dissent from the majority's spartan and conclusory treatment of Causey's compelling argument that the trial of the noncapital charges against him should have been severed from the trial of the capital charges against Davis and Hardy.

## Murder Under "Color of Law"

Conduct under color of law, or its equivalent state action, is an essential element for conviction under 18 U.S.C. §§ 241 and 242, and provides the federal nexus required to turn a garden-variety state law murder into a federal offense punishable by the death penalty. The majority opinion impermissibly and inadvisably waters down this historical and statutory requirement by holding that state action existed in this case because an "air of official authority pervaded the entire incident." This ethereal and poorly defined test subverts the color of law inquiry, traditionally rooted in some assertion of actual or apparent official authority, and transforms every abuse of official position into conduct attributable to the state.

As the majority concedes, the relevant principles are to be derived in large part from a trilogy of Supreme Court cases. In *United States v. Classic*, 61 S. Ct. 1031 (1941), the Supreme Court addressed the color of law requirement under the statutory predecessors to §§ 241 and 242. *Classic* held that election officials who altered ballots were acting under color of law because the acts were committed in the course of their performance of official duties. *Id*. at 1042-43. The Court held that "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." *Id*. at 1043.

Four years later, in **Screws v. United States**, 65 S. Ct. 1031 (1945), the Supreme Court found action under color of law in another criminal case involving the predecessor to § 242. In **Screws** the defendants, a sheriff, a policeman, and a special deputy, beat a young man to death in the course of effecting an arrest. The Court found action under color of law because the officers were acting pursuant to their "duty under Georgia law to make the arrest effective." **Id**. at 1038. The Court took special pains to note that the criminal statutes must be construed in a manner that "respect[s] the proper balance between the States and the federal government in law enforcement." **Id**. at 1039.

Finally, in **United States v. Price**, 86 S. Ct. 1152 (1966), the Supreme Court directly examined the color of law requirement embedded in §§ 241 and 242. **Price** involved the brutal murder of three civil rights activists at the hands of a Mississippi sheriff, two other officers and some private citizens. The civil rights activists had been arrested and held prisoner in the county jail. Law enforcement authorities subsequently pretended to release the men in the middle of the night, having arranged that they would be ambushed on the road. The men were intercepted on the road out of town and taken to a remote place where at least eighteen people participated in their murder. The Court found action under color of law, observing that the conduct "was made possible by state detention and calculated release of the prisoners by an officer of

37

the State." *Id*. at 1157.

The *Classic*/*Screws*/*Price* trilogy illustrates the principle embraced by our Court that a defendant is not acting under "color of law" when he or she is "pursuing private aims and not acting by virtue of state authority." *Harris v. Rhodes*, 94 F.3d 196, 197 (5th Cir. 1996) (quoting *United States v. Tarpley*, 945 F.2d 806, 809 (5th Cir. 1991)); *see also Price*, 86 S. Ct. at 1157 n.7. The Court has held that such defendants are not acting under color of law "purely because they are state officers." *Harris*, 94 F.3d at 197 (quoting *Tarpley*, 945 F.2d at 808). To the contrary, conduct is not committed under color of law unless the conduct includes some assertion of actual or apparent authority granted by the state. *See Price*, 86 S. Ct. at 1157; *Screws*, 65 S. Ct. at 1039; *Classic*, 61 S. Ct. at 1042-43; *see also Tarpley*, 945 F.2d at 809 ("Tarpley did more than simply use his service weapon and identify himself as a police officer. At several points during his assault of Vestal, he claimed to have special authority for his actions by virtue of his official status.").

That principle is aptly illustrated by the Supreme Court cases. In *Classic*, Louisiana election officials charged with altering and falsely counting ballots cast in a primary election were acting under color of law because the conduct was "committed in the course of their performance of duties under the Louisiana statute requiring them to count the ballots, to record the result

of the count, and to certify the result of the election." *Classic*, 61 S. Ct. at 1042-43 (internal quotations omitted). Thus, it is clear that the defendants in *Classic* committed the offense while in the course of performing their official duties. They abused that position by exceeding the scope of the authority granted by the state. But it was more than the mere abuse of their position that caused the Supreme Court to hold that the defendants' conduct was committed under color of state law. The Court's analysis placed equal emphasis on the fact that the defendants' conduct would not have been possible but for the state's grant of access to and authority over the election ballots that were fraudulently altered or falsely counted. *Id*. at 1043-44.

The majority relies heavily upon Davis' use of his police pager, radio, and patrol car to facilitate the offense. But these items did no more than just that. There is nothing about these items that rendered the offense possible and nothing about the absence of these items that would have rendered the offense impossible. This is because both Davis' malevolent plan to execute Groves and his conduct to set that plan in motion were separate and apart from his status as a police officer. Davis' reliance upon the accouterments of his office, such as his use of the police radio to confirm Groves' murder, were matters of convenience or expediency, rather than matters of necessity. I conclude that the conduct in this case presents nothing more than abuse of position,

39

which *Classic* teaches is insufficient standing alone to establish conduct fairly attributable to the state as state action.

In *Screws*, Georgia law enforcement officials who beat a young man to death in the course of an arrest were acting under color of state law because they were acting pursuant to "their duty under Georgia law to make the arrest effective." *Screws*, 65 S. Ct. at 1038. The color of law inquiry in *Screws*, like *Classic*, focuses upon the fact that the defendants had embarked upon the execution of some official duty when the breach of public trust or authority occurred. *Id*. at 1039 ("*Classic* is, therefore, indistinguishable from this case so far as 'under color of' state law is concerned. In each officers of the State were performing official duties; in each the power which they were authorized to exercise was misused.").

Applying *Classic* and *Screws* to the case at hand, it is clear that Davis had not been delegated any authority or discretion though official channels to vindicate his personal animus against Groves by killing her. Indeed, such conduct is affirmatively prohibited by state law. *See Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 481-86 (5th Cir. 1994) (en banc) (Garza, J., concurring in part and dissenting in part) (citing *Barney*, 24 S. Ct. 502 (1904) for proposition that "state action does not exist when the act complained of was not only not authorized, but was forbidden by state legislation" (internal quotations and alterations omitted)).

40

Davis' fortuitous and dispensable use of the equipment issued to him was simply an abuse of his position, rather than abuse in the course of some official duty.

In *Price*, Mississippi law enforcement officers asserted their official capacity to first detain, and then arrange a calculated release of, their intended victims for the purpose of assaulting, and ultimately killing, their victims. *Price*, 86 S. Ct. at 1155. *Price*, which creates the possibility that ordinary citizens may act in concert with state officials under color of state law, hinges upon the defendants' assertion of actual or apparent authority to arrest the victims, a duty delegated to the relevant law enforcement authorities as a matter of state law. *Id*. at 1156–57. Although state officials pretended to relinquish control over the victims in *Price*, the defendants/law enforcement officers in that case never actually relinquished control, but instead delivered the victims unto a brutal demise at the hands of other law enforcement officers and their co-conspirators. Thus, *Price* embodies those principles inherent in *Classic* and *Screws*. The incident would not have been possible but for the defendants' controlled release of their intended victims from official police custody, and the incident was the direct result of the defendants' assertion of actual or apparent authority to arrest.

This case involves none of those factors. There is no but for relationship between Davis' status as a police officer and Groves'

41

murder.  Davis' conduct was not committed in the course of any ordinary police duty.[6]  Moreover, neither Davis nor any other defendant asserted any actual or apparent authority granted by the state as an initial or final justification for Groves' murder.  Applying the principles established in **Classic**, **Screws** and **Price**,[7] I find the theory that the defendants (a rogue police officer, a drug dealer, and the drug dealer's side kick) were in this case engaged in state action under color of state law to be nothing short of ridiculous.

_____

[6]  The majority finds great significance in Davis' statement that he could get Hardy to murder Groves and then handle the "thirty." But Davis' speculation to his partner was never borne out.  Davis did not, in fact, handle the "thirty," and there is no evidence in the record that he in fact would have had any authority to do so.

[7]  Both the majority and concurring opinions purport to rely upon **Monroe v. Pape**, 81 S. Ct. 473 (1961) as breaking new ground for purposes of determining when conduct is committed under color of law.  But **Monroe** does not purport to adopt any new standards relevant to the inquiry.  To the contrary, **Monroe** merely reaffirms the principles previously announced in **Classic** and **Screws**.  *See* **Monroe**, 81 S. Ct. at 484 ("We conclude that the meaning given 'color of' law in the **Classic** case and in the **Screws** and **Williams** case was the correct one; and we adhere to it."); *see also* **Williams v. United States**, 71 S. Ct. 576, 577 (1951) ("The question in this case is whether a special police officer who in his official capacity subjects a person suspected of crime to force and violence in order to obtain a confession may be prosecuted" for conduct under color of law.); *id*. at 578 (noting that the victim was interrogated pursuant to "an investigation conducted under the aegis of the State"); *id*. (noting that the defendant "had a semblance of policeman's power from Florida . . . [;] acted under authority of Florida law; and . . . was asserting the authority granted him and not acting in the role of a private person"). **Monroe**, which presented the question of whether police exceeded their authority in the scope of an official investigation, cannot faithfully be cited as extending or broadening the color of law concept as defined in earlier Supreme Court cases.

42

Our Circuit authority is consistent. In **United States v. Tarpley**, 945 F.2d 806, 808 & n.2 (5th Cir. 1991) a jealous husband lured his wife's lover, Vestal, to the defendant's home. When Vestal arrived, Tarpley beat him with "sap gloves" filled with lead and stuck his service revolver into Vestal's mouth, telling Vestal that "he was a Sergeant on the police department, and that he would and should kill Vestal, and that he could get away with it because he was a cop." **Id**. at 808. Defendant continued beating Vestal and then instructed his wife to call another police officer to the house. When that officer arrived, the officer confirmed to Vestal that the defendant had shot people in the past. **Id**. The Court found action under color of law, in large part because Tarpley had claimed to have special power by virtue of being a police officer to beat, or even kill Vestal, with impunity. **Id**. (Tarpley told Vestal: "I'll kill you. I'm a cop. I can."). Similarly, in **Bennett v. Pippin**, 74 F.3d 578, 589 (5th Cir. 1996), an analogous § 1983 case, a sheriff raped a witness whom he had just interviewed. When his victim resisted his advances, the sheriff told her "I can do what I want, I'm the Sheriff." **Id**. The Court found action under color of law because the Sheriff's actions were an abuse of power uniquely held by virtue of the Sheriff's position, and because "the explicit invocation of governmental authority constituted a 'real nexus' between the duties of Sheriff and the rape." **Id**. (citing **Taylor Indep. Sch. Dist.**, 15 F.3d at 452 n.4). In sum, Supreme

43

Court and Fifth Circuit precedent are consistent -- when the defendant is acting *pursuant to* state granted authority or an assertion of state granted authority, but exceeds or abuses that authority, the defendant is acting under color of law.

For example, the conduct of a bad law enforcement officer in the process of arresting someone or interviewing a witness, or even, under current precedent, the misconduct of a public school teacher who places a child's physical well being in grave danger, *see* **Taylor Indep. Sch. Dist.**, 15 F.3d 433, may constitute conduct under color of state law.[8]  When, however, the defendant is acting in an area that is completely apart from and derives no "color" from the state's affirmative grant of authority or discretion to

_____

[8]  Whatever color of law there is in this case must be derived from the conduct of Davis, the New Orleans police officer.  It is true that even a patrolman at the bottom of the police totem pole, like Davis in this case, may exercise certain powers and duties which are derivative of his authority as a police officer and the exercise of these powers is clearly under "color of law."  A patrolman may enforce the traffic laws of the city and issue a ticket or citation to a citizen whom he observes in violation of such laws; but Davis never issued any kind of citation or ticket to Groves in this case.  A patrolman may make an investigative stop of a citizen if he has a reasonable suspicion that the citizen may be engaging in some sort of criminal activity; but Davis never made an investigative stop of Groves in this case.  A patrolman may serve and execute a warrant for arrest upon a citizen; but Davis never executed any warrant for arrest on Groves in this case.  A patrolman may arrest without a warrant and take into custody any citizen whom he observes to be committing a crime; but Davis never purported to arrest Groves and never had any custody of any kind of Groves.  A patrolman may direct traffic, order individual citizens to stay behind police barricades at an accident or crime scene, and order individual citizens to leave or vacate certain premises on the grounds of public safety; but there is no evidence in this case that Davis ever exercised any such authority as to Groves.

44

the official, the conduct is not committed under "color of law." Our decision in *Tarpley* is the only binding case that even potentially deviates from that pattern, and that case is distinguishable (and was distinguished by the panel hearing the case) by the defendant's express invocation of his police authority.

Our error in diminishing the test for conduct under color of law is compounded in this case because the majority has borrowed, without apology, elaboration, or explanation, from the host of § 241 and § 242 cases that involve a relatively minor penalty. Title 18 U.S.C. § 241 and § 242 were passed to address the residual effects of slavery. For most of the significant history of these civil and criminal provisions, the maximum penalty to be assessed was a fine and a term of imprisonment not to exceed ten years. While Congress increased the potential penalty under these statutes in the 1960's, it was not until September 1994 that the death penalty became an available sanction, and this case appears to be the first case in which the death penalty has been imposed upon defendants charged with a deprivation of civil rights in violation of these Civil War reconstruction statutes. Surely where the ultimate penalty of death is at issue, for the crime of murder which is traditionally punished under state law, we should be even more diligent in requiring that the evidence clearly support the hypothesis that the offender's conduct was colored by some grant of

45

state authority.  Surely we should not be willing to torture the meaning ascribed by the Supreme Court to the requirement that conduct be committed under color of state law by adopting, sheared of its factual context, a new legal standard requiring only that an air of official authority pervade the incident, particularly when that standard is based upon a single descriptive phrase in this Court's disposition in *Tarpley*.

The facts of this case are chilling.  Davis and Hardy deserve the death penalty for their part in the premeditated murder of Kim Groves.  But we should not dilute or obscure the statutory requirement that conduct be committed under color of state law just to save these federal convictions.  The Supreme Court has cautioned that statutes requiring conduct under color of law "should be construed so as to respect the proper balance between the States and the federal government in law enforcement." *Screws*, 65 S. Ct. at 1039.  If this concept of federalism is to have any meaning at all, then the State of Louisiana is the proper governmental entity to proscribe and punish the murderers in this case.  As the Supreme Court said in *Screws*:

> Our national government is one of delegated powers alone.  Under our federal system the administration of criminal justice rests with the States except as Congress, acting within the scope of those delegated powers, has created offenses against the United States.  As stated in *United States v. Cruikshank,* 92 U.S. 542, 553, 554, 23 L.Ed. 588 [(1875)], "It is no more the duty or within the power of the United States to punish for a conspiracy to falsely imprison or murder within a

46

> State, than it would be to punish for false imprisonment or murder itself." It is only state action of a "particular character" that is prohibited by the Fourteenth Amendment and against which the Amendment authorizes Congress to afford relief. Thus Congress in § 20 of the Criminal Code did not undertake to make all torts of state officials federal crimes. It brought within § 20 only specified acts done "under color" of law and then only those acts which deprived a person of some right secured by the Constitution or laws of the United States.

*Id*. (internal citations omitted); *see also id*. at 1037. I would hold that the government failed to satisfy its burden of establishing a sufficient federal nexus with respect to counts 1 and 2 against all defendants. I would therefore vacate the defendants' federal convictions for violation of 18 U.S.C. §§ 241 and 242 and remand the case to the district court for dismissal of the indictments. Under our federal system, the State of Louisiana is the only right and proper forum for the trial and punishment of these defendants.

**CAUSEY'S TRIAL WITH CAPITAL DEFENDANTS**

I also dissent from that portion of part 4 of the majority opinion that affirms the district court's refusal to sever the trial of the noncapital charges against Causey from the trial of the capital charges against Davis and Hardy.

The majority applies what appears to be an almost per se rule that the trial of a capital defendant with a noncapital defendant will never raise concerns sufficient to justify severance. The majority supports this remarkable position with *Buchanan v. Kentucky*, 107 S. Ct. 2906 (1987). But *Buchanan* involved Supreme Court review of a state law conviction. Moreover, the Supreme Court made express note of the fact that the noncapital defendant did not seek severance in that case. *Id*. at 2909. Rather, *Buchanan* involved only a state prisoner's constitutional claim that his joint trial with capital co-defendants violated his Sixth Amendment right to an impartial jury drawn from a fair cross section of the community. *Id*. at 2908.

This case is easily distinguishable. First, this is a direct appeal from federal convictions. Indeed, this is the first reported decision in which a noncapital defendant was tried with multiple capital defendants in federal court under the procedures set forth in the Federal Death Penalty Act, 18 U.S.C. § 3591-3598. Thus, no federal appellate court has ever considered, as a matter of direct appeal, whether the trial of a noncapital defendant with

48

multiple capital defendants under the Federal Death Penalty Act may infringe upon the trial rights of the noncapital defendant. Further, the Federal Death Penalty Act, which specified a number of the procedures and substantive issues material to Davis' and Hardy's capital trial, was not passed until 1994, long after the decision in *Buchanan*, and only one month before the offense at issue in this case. Even if *Buchanan* is binding as to the relatively modest principle that the trial of noncapital defendants with capital defendants is not per se error, that principle does nothing to preclude the possibility of error based upon the statutory structure of the Federal Death Penalty Act or the facts of this case. I think our review should acknowledge and meet head on the particular issues raised by application of this new federal sentencing scheme with its many requirements, in this trial involving a noncapital defendant.

Second, Causey sought and was denied severance. Unlike the relatively limited issue in *Buchanan*, Causey's challenge to his federal conviction on direct appeal calls into question whether he was prejudiced with respect to a number of his statutory and constitutional trial rights. Indeed, the record in this particular case establishes that many of the federal district court's decisions in this matter, from jury selection through jury submission, were driven by the fact that both Davis and Hardy faced the death penalty. Because I believe that these decisions

49

compromised Causey's right to a fair trial, I would hold that the district court's refusal to sever noncapital defendant Causey's trial from the trial of capital defendants Davis and Hardy constituted an abuse of the court's discretion on the facts of this case.

I recognize that there is a preference for jointly trying defendants who have been jointly named in the same indictment. *See Zafiro v. United States*, 113 S. Ct. 933, 937 (1993); *see also* FED. R. CRIM. P. 8(b). But severance is appropriate when a joint trial will compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about the guilt or innocence of one of the defendants. *See Zafiro*, 113 S. Ct. at 938; *see also* FED. R. CRIM. P. 14 (permitting severance when joint trial would prejudice a party). Causey contends that his statutory and constitutional rights to a speedy trial, his right to participate fully and fairly in the jury selection process, and his right to be free from the effect of unduly prejudicial and irrelevant spillover evidence with no relevance to his prosecution, were violated in this particular case by the district court's refusal to sever his trial. The majority opinion states, in a single conclusory sentence, that Causey failed to make the showing of strong prejudice required to justify severance. I disagree. To the contrary, this case is rife with the type of prejudice that should cause us to hold that a noncapital defendant like Causey should not

be tried together with capital defendants in federal court.

Causey's joint trial with capital co-defendants operated to deprive him of his statutory and constitutional right to a speedy trial. Title 18 U.S.C. § 3161(c)(1) provides the general rule that trial should occur within seventy days of indictment or arraignment. Causey was indicted and detained on the charges in this case in December 1994. Causey was not tried on those charges until April 1996, a delay of sixteen months. Three of the four continuances sought in Causey's case were expressly tied to the fact that the government was seeking the death penalty against Davis and Hardy. The last two continuances, which together engendered a delay of four months, were granted over Causey's express objection that his speedy trial rights were being compromised and that severance was required. While the speedy trial statute permits "a reasonable period of delay" attributable to co-defendants, *see* 18 U.S.C. § 3161(h)(7), I do not consider the extended period attributable to Davis' and Hardy' capital status reasonable in this case. Whatever judicial expedience might justify the joint trial of capital and noncapital defendants, that expedience is severely undermined when the capital status of one defendant causes a delay of more than one year in the trial of a noncapital defendant.

Causey's joint trial with capital co-defendants compromised his right to participate fully and fairly in the selection of his

51

jury. The district court initially allowed each side twenty-six peremptory challenges. Causey complained in the district court, and urges again on appeal, that his noncapital status was used, first by his co-defendants and then by the district court, to deny his right to participate equally in the jury selection process. When Causey raised this complaint, Causey maintains, and the government does not dispute, that the district court informed him that, if forced to intervene, the district court would allow Causey only six peremptory challenges, while permitting each of his capital co-defendants ten peremptory challenges each. There does not appear to be any sound justification for limiting Causey's participation in the process of jury selection in this manner.

Causey's joint trial with capital co-defendants also raises important questions about the fundamental fairness of subjecting a noncapital defendant to the process required to assemble a death qualified jury in a capital case. The process of selecting a jury in a capital case is, and should necessarily be, different from the process involved in selecting the jury in a noncapital case. To the extent that the prosecution exercises its rights to qualify all jurors on their ability to assess the death penalty, there will inevitably be individuals excluded on those grounds in a capital case who would not have been excluded in a noncapital case. Consequently, if you try a noncapital defendant with a capital defendant the government will be permitted to exclude jurors for cause on grounds which it could not use as a grounds for exclusion

if the noncapital defendant was being tried separately. Surely if a noncapital defendant were being tried separately, the government could not exclude jurors for cause on the grounds of their opposition to the death penalty since that would be a matter completely irrelevant to the decision in that particular case. Likewise, in a joint trial involving capital and noncapital defendants, the capital defendants can exercise peremptory challenges against prospective jurors who express sentiments in favor of the death penalty. These same jurors may be acceptable, or even desirable, to a noncapital defendant for reasons other than their being prepared to assess the death penalty. The noncapital defendant, therefore, gets whipsawed between the state's objection for cause and the capital defendant's peremptory challenge into having a jury composed of individuals who are entirely different from those who would be selected if the noncapital defendant was being tried without capital defendants.

This is precisely what Causey says happened in this case. Given the capital charges against Davis and Hardy, the district court permitted the parties to circulate an extensive questionnaire to potential jurors prior to the time formal voir dire began. Those questionnaires provide a great deal of insight into the potential jurors' views as to the death penalty and other issues. The record reflects that Causey objected both to government strikes eliminating potential jurors expressing sentiment against the death penalty, as well as to his co-defendants' strikes eliminating

jurors expressing sentiment in favor of the death penalty.  Causey asserts that many of these jurors would have been acceptable, or even desirable, to him.  For example, Causey claims that some of the jurors eliminated by the government for expressing anti-death penalty sentiment also expressed a skepticism about government testimony induced by a plea bargain.  Causey also claims that his co-defendants eliminated certain African-American jurors who were perceived to be leaning toward the death penalty.  Viewed as whole, the record reflects that Causey's right to participate fully and fairly in the jury selection process was compromised by the capital nature of the charges brought against Davis and Hardy.

Another problem that raises its ugly head is the contention that a death qualified or capital jury is necessarily more conviction prone.  I recognize that several courts, including this one, have expressed reservations about the scientific evidence supporting the proposition that a death qualified jury is necessarily more conviction prone. *See*, *e.g.*, ***Lockhart v. McCree***, 106 S. Ct. 1758, 1762-64 (1986); ***Witherspoon v. Illinois***, 88 S. Ct. 1779, 1774-75 (1968); ***Spinkellink v. Wainwright***, 578 F.2d 582, 593 (5th Cir. 1978). Without regard to the empirical basis for the scientific evidence, I believe that most trial judges (including the district court judge in this case who said as much in the hearing on Causey's motion to sever) would be willing to acknowledge the common sense proposition that death qualified

54

juries tend to be more conviction prone. The real question is whether that fact necessarily operates to prejudice a noncapital defendant and whether there are strong governmental interests supporting the empanelment of a death qualified jury for trial of a noncapital defendant. *See*, *e.g.*, **Buchanan**, 107 S. Ct. at 2913-16.

Courts have been hesitant to indulge such a presumption, for example, when to do so would require that trial courts empanel a different jury for the guilt and punishment phases of a capital trial. *See* **Lockhart**, 106 S. Ct. 1758. In such cases, the government has a strong interest in its legislation specifying a unitary jury system. *See* **id**. at 1769-69. Moreover, the possibility that a capital jury which heard the guilt phase of the trial will entertain a residual doubt as to the defendant's guilt, which might serve to benefit the capital defendant during the penalty phase of the capital trial, is used to justify the premise that the use of a death qualified jury during the guilt phase of the capital trial may be beneficial to a capital defendant. **Id**. Obviously, that justification for rejecting the common sense proposition that death qualified juries are more likely to convict is not applicable when the issue is whether a noncapital defendant should be tried with co-defendants who face the death penalty. In the federal system a noncapital defendant will never face a separate jury determination of punishment.

The empanelment of a death qualified jury in a case involving a noncapital defendant, or at least a refusal to sever, may also be supported by the state's interest in avoiding the burden and expense of two trials. *Buchanan*, 107 S. Ct. at 2915; *Lockhart*, 107 S. Ct. at 1769. However, that rationale is inapplicable in this case because the district court expressly found that the evidence to be offered at the guilt phase of trial was such that the burden of trying Causey separate would be minimal. I conclude, therefore, that there were no important governmental interests to be vindicated and no potential benefit to Causey to be obtained from trying the noncapital charges against him before the death qualified jury empaneled to hear the capital charges against Davis and Hardy.

Moreover, and without regard to whether death qualified juries are more conviction prone in the run of cases, my review of this record persuades me that the need to death qualify the jury in this case resulted in a panel that was clearly prosecution oriented and that was much more likely to convict. Of the twelve jurors selected, ten described themselves in the jury questionnaire as "pro-death penalty." Eleven of the twelve jurors agreed that the "death penalty gives the criminal what he deserves," and disagreed that the death penalty was unfair to minorities. Ten of the twelve jurors stated that they disagreed or strongly disagreed with the statement that our system should err on the side of letting a few

56

guilty people go free rather than on the side of convicting the innocent. All twelve jurors were comfortable with the use of undercover agents and informants and ten of the twelve jurors had no objection to the use of government wire taps. Of the five jurors that gave responses, four indicated they would have no concern about government testimony induced by lenient treatment. These last responses are particularly troubling given the role that government undercover operations and induced testimony played in this case, and Causey's assertion that certain pro-death penalty jurors eliminated by his co-defendants displayed a healthy measure of skepticism about the relative weight of testimony procured by those means. Having reviewed this record, including the questionnaires submitted by the larger venire panel as compared to the jury selected, it is clear to me that the jury selection process necessitated by Davis' and Hardy's capital status led to the empanelment of a strongly pro-government or conviction-prone jury. Given that Causey was not exposed to the death penalty, I do not feel that whatever societal or governmental interests may weigh in favor of permitting a death qualified jury to hear the guilt portion of a capital trial should have been permitted to operate to his detriment in this case. *Cf*. **Spinkellink**, 578 F.2d at 593-94 (commenting upon the absence in that case of evidence that death qualification led to a more conviction prone or impartial jury).

I am also concerned that death qualification may, in some

57

cases, operate to systematically exclude certain distinctive groups from jury service. *See* **Lockhart**, 106 S. Ct. at 1771 (Marshall, J., dissenting) ("The data strongly suggest that death qualification excludes a significantly large subset--at least 11% to 17%--of potential jurors who could be impartial during the guilt phase of trial. Among the members of this excludable class are a disproportionate number of blacks and women." (footnote omitted)). In this case, three African-American defendants were tried in New Orleans, Louisiana, a community with a very large African-American population. The jury selection process used in this case makes it difficult to set exact numbers, but it is clear that the panel of potential jurors included a significant number of African-American citizens. Of the 151 prospective jurors who answered the questionnaire, at least 42 (or 28 percent) were African-American. And yet only one African-American was selected to sit on the jury during the trial. I do not posit that race may be used as a proxy for determining how a particular juror will vote, or whether a particular jury is impartial. I do contend that death qualification may have unintended and undesirable consequences, such as those identified by the dissenting Justices in **Lockhart** and **Buchanan**, and those identified by Causey in this appeal. Once again, to whatever extent those consequences might be tolerable when balanced against the government's strong interest in empaneling a qualified jury as to capital charges, I would hold

58

that such a consequence is intolerable and impermissible when applied to a case such as Causey's, in which the government did not seek the death penalty, and in which the burden of separate trial would be minimal.

I recognize that Causey's evidence that the death qualification procedure in this case had the effect of producing a conviction prone jury or excluding African-American jurors may not be sufficient standing alone to establish a Sixth Amendment claim that he was deprived of an impartial jury drawn from a fair cross section of the community. But we are dealing here with the narrower issue of severance. In this case, evidence that the death qualification procedure excluded African-American citizens tends to establish another form of prejudice required to support his motion for severance.

Finally, Causey was also prejudiced by a large quantity of prejudicial spillover evidence relating to the criminal relationship between Davis and Hardy that had little, if any, bearing upon Causey's case. Causey points, for example, to the prejudicial testimony of Davis' police partner, Sammie Williams, and of unindicted co-conspirator Steve Jackson, both of whom testified they had only very limited knowledge concerning Causey. Moreover, there was an amazing volume of evidence documenting the grisly details of the Davis/Hardy relationship and their brutal and mercenary crimes that had only tangential, if any, relevance to Causey.

59

There is also evidence in the record that the district court's evidentiary rulings were guided by considerations relevant to Davis' and Hardy's capital status and without any consideration of Causey's position or interest. For example, Causey objected to certain prejudicial evidence relating to the meaning of the phrase "rock-a-bye-baby." Causey's co-defendants desired to enter a stipulation as to the meaning of that phrase, to which Causey objected. At a hearing in which that stipulation was entered over Causey's objection, the following exchange occurred:

Counsel for Causey: Yesterday the proposed stipulation about this rock-a-bye-baby came up. Nobody asked me, which is par for the course.

District Court: That's because your client is not facing the death penalty.

This example, in which the district court expressly invoked Davis' and Hardy's capital status as a basis for providing notice of certain evidentiary decisions illustrates the extent to which those defendants' capital status infused the entire trial and caused a subjugation of Causey's rights to those of the capital defendants.

For the foregoing reasons, I would hold that the district court's refusal to grant Causey a separate trial constituted an abuse of discretion on the facts of this case. I think the majority opinion fails to grapple with the vexatious issues arising from the trial of a noncapital defendant such as Causey, who played a relatively minor role in the conspiracy, with capital defendants such as Davis and Hardy, against whom the government offered an

impressive quantity of evidence relating to larger criminal enterprises in which defendant Causey had no role. I respectfully dissent from that portion of the majority's decision affirming the district court's denial of Causey's motion to sever his trial from that of his co-defendants Davis and Hardy.

ENDRECORD

DENNIS, Circuit Judge, concurring:

I join fully in the majority opinion and assign additional reasons for concurring.

**I. The Defendants' Convictions Under 18 U.S.C. § 242**

The defendants did not object below or argue here that the due process "fair warning requirement" was not satisfied in these cases, i.e., that they have been held criminally responsible for conduct which they could not reasonably understand to be proscribed by 18 U.S.C. § 242.  During the pendency of this appeal, the Supreme Court, in *United States v. Lanier*, 520 U.S. 259 (1997), clarified the fair warning requirement.  That decision caused me to have concern that a failure to satisfy the fair warning requirement, which may have been an unclear error at trial, may now have become clear on appeal because the applicable law has been clarified.  "In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise affect the fairness, integrity, or public reputation of judicial proceedings." *United States v. Atkinson*, 297 U.S. 157, 160 (1936).  *See also* FED. R. CRIM. P. 52(b); *United States v. Olano*, 507 U.S. 725, 732 (1993).  Also, even if there is not plain error in this respect, *Lanier* must be taken into account in this court's evaluation of the defendants' insufficiency-of-evidence arguments.  It now may be inferred from

*Lanier* that we must determine that each defendant was given fair warning, as clarified by *Lanier*, prior to his charged criminal conduct, that such particular course of conduct would amount to an act under color of law in deprivation of a person's constitutional right, in order to determine correctly whether there was sufficient evidence for a reasonable juror to find beyond a reasonable doubt that the defendant violated 18 U.S.C. § 242 by engaging in such conduct.

I ultimately conclude that the fair warning requirement, as clarified by *Lanier*, was satisfied as to each defendant, and that there was sufficient evidence as to each element of the charged crimes to constitutionally support their convictions. Accordingly, I concur in the majority opinion and judgment, but express my reasoning in this separate opinion to give defense counsel, as well as colleagues of the bench and bar, a fair opportunity to point out any flaws that it may contain.

## A. The Statute and the Issues

Section 242, Title 18, United States Code, in pertinent part, provides:

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of

> citizens,[shall be subject to specified criminal penalties].

Specifically stated, the issues of concern are: (1) whether 18 U.S.C. § 242, the constitutional provisions it incorporates, and the federal court decisions interpreting them, gave fair warning to the defendant, Len Davis, that a state officer who, while acting under color of law, intentionally and without justification causes a person to be deprived of her right to life, violates a right that had been made specific either by the express terms of the Constitution or laws of the United States, or by decisions interpreting them; (2) whether the defendant police officer, Len Davis, also was given fair warning by the statute, its incorporated constitutional provisions, and decisions interpreting them, that his course of conduct in causing Kim Marie Groves to be deprived of her right to life amounted to acts under color of law; and (3) whether the private person defendants, Paul Hardy and Damon Causey, were given fair warning that Len Davis was a state official acting under color of law when he caused Kim Marie Groves to be deprived of her right to life, and that their intentional participation with Davis in that homicide would therefore also constitute acts under color of law in violation of Kim Marie Groves's constitutional right to life that had been made specific by 18 U.S.C. § 242, its incorporated constitutional and statutory provisions, and the federal court decisions interpreting them.

## B. *United States v. Lanier*

In *United States v. Lanier*, 520 U.S. 259 (1997), a state judge had been convicted under 18 U.S.C. § 242 of criminally violating the constitutional rights of five women by assaulting them sexually in his chambers. A panel of the Court of Appeals for the Sixth Circuit affirmed the convictions and sentence, *United States v. Lanier,* 33 F.3d 639 (6th Cir. 1994), but the full court, on rehearing en banc, set aside the convictions for lack of any notice to the public that § 242 covers simple or sexual assault crimes, holding that § 242 criminal liability may be imposed only if the constitutional right allegedly violated is first identified by a decision of the Supreme Court, and only when the right has been held to apply in a factual situation "fundamentally similar" to the one at bar. *United States v. Lanier,* 73 F.3d 1380, 1393 (6th Cir. 1996) (en banc). The Supreme Court granted certiorari, declared that "[t]he question is whether this standard of notice is higher than the Constitution requires, and we hold that it is[,]" *Lanier*, 520 U.S. at 261, vacated the judgment, and remanded for application of the proper standard "[b]ecause the Court of Appeals used the wrong gauge in deciding whether the prior judicial decisions gave fair warning that respondent's actions violated constitutional rights. . . ." *Id.* at 272.

Because § 242, in lieu of describing the specific conduct it forbids, incorporates constitutional guarantees by reference, which

themselves are stated "with some catholicity of phrasing[,] [t]he result is that neither the statute[] nor a good many of [its] constitutional referents delineate the range of forbidden conduct with particularity."  *Id.* at 265.  The irony of this is that a prosecution to enforce one application of § 242's protection of due process can threaten the accused with deprivation of another: "what Justice HOLMES spoke of as 'fair warning . . . in language that the common world will understand, of what the law intends to do if a certain line is passed.  To make the warning fair, so far as possible the line should be clear.'"  *Id.* (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931)).  "'"The . . . principle is that no man shall be criminally responsible for conduct which he could not reasonably understand to be proscribed."'"  *Id.* (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964) (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954))).

In *Screws v. United States*, 325 U.S. 91 (1945), a plurality of the Supreme Court recognized that the openness of the constitutional guarantees, when incorporated by reference into § 242, generally are ill-suited to the task of giving fair warning about the scope of criminal responsibility.  At the same time, that plurality declared that this constitutional difficulty does not arise when the accused is charged with violating a "'right which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions

interpreting them.'" *Lanier,* 520 U.S. at 267 (quoting *Screws*, 325 U.S. at 104). "Accordingly, *Screws* limited the statute's coverage to rights fairly warned of, having been 'made specific' by the time of the charged conduct." *Id.*

Consequently, the Supreme Court in *Lanier* concluded that the Sixth Circuit erred in adding as a gloss to this standard the requirement that a prior decision of the Supreme Court has defined the constitutional right at issue in a factual situation "fundamentally similar" to the one at bar. *Id.* at 268. The Court explained that the *Screws* plurality "referred in general terms to rights made specific by 'decisions interpreting' the Constitution, and no subsequent case has held that the universe of relevant interpretive decisions is confined to our opinions." *Id.* (internal citation omitted). It further explained that the Court has specifically referred to court of appeals decisions in defining the established scope of a constitutional right under § 241 (citing *Anderson v. United States*, 417 U.S. 211, 223-27 (1974)); and in inquiring whether a right was "clearly established" when applying the qualified immunity rule under § 1983 and *Bivens v. Six Unknown Narcotics Agents*, 403 U.S. 388 (1971). *Lanier,* 520 U.S. at 268. According to the Court, "[D]isparate decisions in various Circuits might leave the law insufficiently certain even on a point widely considered, [but] such a circumstance may be taken into account in deciding whether the warning is fair enough. . . ." *Id.* at 269.

Further, the Supreme Court in *Lanier* stated, it had not demanded precedents applying the constitutional right at issue to a "fundamentally similar" factual situation, but that it had upheld convictions under §§ 241 or 242 despite notable factual distinctions between the precedents relied upon and the cases then before the court, "so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Id.* The Sixth Circuit erred, the Supreme Court stated, in concluding that due process fair warning under § 242 demands more than the "clearly established" qualified immunity test under § 1983 or *Bivens*. *Id.* "[T]he object of the 'clearly established' immunity standard is not different from that of 'fair warning' as it relates to law 'made specific' for the purpose of validly applying § 242. . . . To require something clearer than 'clearly established' would, then, call for something beyond 'fair warning.'" *Id.* at 270-71.

"In sum," the Court in *Lanier* concluded, "as with civil liability under § 1983 or *Bivens*, all that can usefully be said about criminal liability under § 242 is that it may be imposed for deprivation of a constitutional right if, but only if, 'in the light of pre-existing law the unlawfulness [under the Constitution is] apparent[.]' Where it is, the constitutional requirement of fair warning is satisfied." *Id.* at 271-72 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).

## C. Fair Warning as to the Constitutional Right Violated

The Supreme Court in *Lanier* pointed out that "general statements of the law are not inherently incapable of giving fair and clear warning, and in [some] instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful." *Id.* at 271 (quoting *Anderson*, 483 U.S. at 640). In my opinion, the guarantees of the Fifth Amendment that "[n]o person shall be deprived of life . . . without due process of law," and of the Fourteenth Amendment that "nor shall any State deprive any person of life . . . without due process of law," together with § 242, made specific every person's right not to be deprived of life without due process of law so as to give "adequate advance notice" that a person who caused such a deprivation while acting under color of law "'would be visited with punishment . . .[and] not punished for an unknowable something.'" *Id.* at 267 (quoting *Screws*, 325 U.S. at 105). Moreover, prior court decisions have given fair warning that willful or intentional deprivation of a person's life without due process of law committed under color of law is punishable under 18 U.S.C. §§ 241 and 242.

In *United States v. Price,* 383 U.S. 797 (1966), the Supreme Court declared that: (1) § 241 reaches conspiracies to injure any citizen in the free exercise or enjoyment of any right or privilege

secured to him by the Constitution; (2) this language includes rights or privileges protected by the Fourteenth Amendment; and (3) this language extends to conspiracies otherwise within the scope of the section participated in by officials alone or in collaboration with private persons. *Id.* at 798.

Moreover, the *Price* Court concluded that "an allegation of official, state participation in murder, accomplished by and through its officers with the participation of others," is an "allegation of state action which, beyond dispute, brings the conspiracy within the ambit of the Fourteenth Amendment." *Id.* at 799.

The Fifth Circuit in *Crews v. United States,* 160 F.2d 746 (5th Cir. 1947), followed the legal principles set forth by the Supreme Court in *Screws* in affirming the conviction under 18 U.S.C. § 52 (now § 242) of a town marshal who murdered a black man. The defendant, who had personal animosity toward McFadden (the decedent), was riding in his nephew's automobile when he spotted McFadden, who allegedly was drunk. Crews guided McFadden without resistance to his nephew's car, put him in the rear seat and drove McFadden to a bridge, where Crews forced him to jump into the river, even though McFadden told him that he could not swim. McFadden drowned. *Id.* at 747-48.

This court affirmed Crews's conviction, concluding that Crews acted "under color of law" in depriving McFadden of the

"constitutional right to life or liberty or to a fair trial under due processes of law rather than a trial by ordeal." *Id.* at 749.

In a civil case arising under §§ 1983, 1981, 1985(3), and 1986, this court in *Brazier v. Cherry,* 293 F.2d 401 (5th Cir.), *cert. denied,* 368 U.S. 921 (1961) (Brown, J.), held that an action against Georgia police officers for the wrongful death of the deceased, allegedly resulting from violations of Federal Civil Rights Statutes, gave rise, by virtue of the Georgia survival statute, of a federally enforceable claim for damages during his lifetime and by his survivors. Before answering the ultimate question of whether such a remedy was available, the court concluded that the Civil Rights Statutes express a "clear congressional policy to protect the life of the living from the hazard of death caused by unconstitutional deprivations of civil rights." *Id.* at 405. According to the court:

> [I]t defies history to conclude that Congress purposely meant to assure to the living freedom from such unconstitutional deprivations, but that, with like precision, it meant to withdraw the protection of civil rights statutes against the peril of death. The policy of the law and the legislative aim was certainly to protect the security of life and limb as well as property against these actions. Violent injury that would kill was not less prohibited than violence which would cripple.
>
> We have fresh evidence of the broad and sweeping aims of Congress with specific regard to § 1983. *Monroe v. Pape* makes an extensive re-examination of the legislative history and summarizes its purpose in this way. "The debates are long and extensive. It is

> abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claim of citizens to the enjoyment of rights, privileges, and immunity guaranteed by the Fourteenth Amendment might be denied by the state agencies." <u>"It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the State and the state remedy need not be first sought and refused before the federal one is invoked."</u>

*Id.* at 404-05 (emphasis added) (internal citations and footnote omitted).

Other courts and judges expressly have recognized that § 242 criminalizes "murder by state officers in the course of official conduct and done with the aid of state power." *Screws,* 325 U.S. at 129 (Rutledge, J., concurring). *See Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir. 1982) (Posner, J.) ("There is a constitutional right not to be murdered by a state officer, for the state violates the Fourteenth Amendment when its officer, acting under color of state law, deprives a person of life without due process of law.") (citing *Brazier,* 293 F.2d at 404-05). *Cf. Beard v. O'Neill,* 728 F.2d 894, 898 (7th Cir. 1984) ("The Fifth Amendment guarantees, among other things, that a person will not be deprived of life without due process of law. Jeff Beard had a constitutional right, therefore, not to be murdered by someone acting under color of federal authority." (citing *Brazier*)), *cert. denied,* 469 U.S. 825 (1984). See also, discussed in more depth below, *United States v.*

*Robinson*, 503 F.2d 208 (7th Cir. 1974), in which the rogue cop who killed Beard (of *Beard v. O'Neill, supra*), was convicted of violations of §§ 241 and 242 for committing the murder for hire. In *Robinson,* however, the defendant did not raise and the opinion does not discuss, but apparently assumes, fair warning and color of law requirements were met.

These cases, along with others discussed later, make it apparent that the "very action in question," i.e., deprivation of a person's life by a state officer in the course of official conduct and done with the aid of state power, is unlawful under the Constitution. *See Lanier,* 520 U.S. at 271.

Arguably, a person also has a separately "defined right" protected by the Constitution not to be deprived of <u>liberty</u> without due process of law, and this right is also violated by having his or her life taken willfully by a state officer acting under color of law. In *United States v. Gwaltney,* 790 F.2d 1378 (9th Cir. 1986), *cert. denied,* 479 U.S. 1104 (1987), the Ninth Circuit affirmed the criminal conviction under § 242 of a California Highway Patrol officer who raped and murdered a woman traveling on the highway. According to the indictment, Gwaltney, "acting under color of law, <u>willfully assaulted and shot</u> Bishop, thereby causing her death and <u>violating her constitutionally protected right not to be deprived of life or liberty</u> without due process of law." *Id.* at 1380-81 (emphasis added).

The *Gwaltney* court held that the following jury instructions were not plainly erroneous:

> [T]he government was obliged to prove that Gwaltney deprived Bishop of a right secured or protected by the Constitution or laws of the United States; that the right not to be deprived of life or liberty without due process of law is such a right; that the <u>right to liberty</u> includes the principle that no person may be physically assaulted, intimidated, or otherwise abused intentionally and without justification by a person acting under color of state law; <u>and</u> that the <u>right not to be deprived of life</u> without due process of law prohibits a police officer acting under color of law from killing any person without justification.

*Id.* at 1387 (emphasis added).

Other courts, including the Fifth Circuit, sometimes have framed the "defined right" exclusively as the right to liberty without due process. In *United States v. Hayes,* 589 F.2d 811 (5th Cir.), *cert. denied,* 444 U.S. 847 (1979), this court affirmed the conviction under § 242 of a police chief who, along with his son-in-law and two other officers, arrested a suspected burglar, drove him to a deserted area, and shot him to death. The police chief later arranged for his wife, daughter, and sister-in-law to transport the body 400 miles, where they buried the body in a shallow grave in an isolated area. The indictment in *Hayes* charged the police chief with "depriving Richard A. Morales of the <u>right to liberty</u> without due process of law, resulting in the death of Richard A. Morales." *Id.* at 816 (emphasis added).

This court in *Hayes* declared that the "defined right" which had been violated was the "right to be tried by a court, and not by ordeal, and thus <u>to be free from unlawful assault</u> by state law enforcement officers when lawfully in their custody." *Id.* at 820 (emphasis added). According to the court, the 1968 amendment to § 242, which added life imprisonment where "death results," "alter[ed] the statute only insofar as requiring the additional element that death ensued as a proximate result of the accuseds' willful violation of the victim's defined rights." *Id.* Significantly, this court declared:

> The amendment to Section 242 . . . did not proscribe any additional Conduct which was not already punishable under the unamended version of Section 242. Rather, those cases of infringement with defined rights which result in death are a subset of the universe defined as those cases of infringement with defined rights. Activities which fall within the former naturally fall within the latter.

*Id.* at 821.[9]

Even though the Fifth Circuit held in the earlier case of *Crews,* and suggested in *Brazier,* that when a murder is committed under color of state law, the "defined rights" are life or liberty,

---

[9] The Fifth Circuit in *United States v. Stokes,* 506 F.2d 771 (5th Cir. 1979), held that when a prisoner is assaulted (but not killed) by police, the right to due process under § 242 is not limited to "a right not to be summarily punished or deprived of a trial by law," but also includes the <u>right not to be deprived of liberty</u>, which encompasses the right to be "<u>free from unlawful attacks upon the physical integrity of his person</u>." *Id.* at 773 & n.2, 774 (emphasis added).

*Hayes* made it apparent that whether the victim of an assault lives or dies, the "defined right" is liberty, rather than life. Thus, under *Hayes,* the jury in the present cases was properly instructed.[10]

Similarly, in *United States v. Lebron-Gonzalez,* 816 F.2d 823 (1st Cir.), *cert. denied,* 484 U.S. 843, 857 (1987), the First Circuit, in affirming the criminal conviction under §§ 241 and 242 of a police officer who murdered a prosecution witness, found no clear error in the following jury instruction:

> [O]ne of the liberties secured to the victim involved in this case by the Constitution is the <u>liberty to be free from unlawful attacks upon her person</u>. It has always been the policy of the law to protect the <u>physical integrity of every person from unauthorized violence</u>. <u>Liberty thus includes the principle that no person may ever be physically assaulted, intimidated, or otherwise abused intentionally</u> and without justification by a person acting under the color of law of any state.

*Id.* at 829 (emphasis added).

In sum, whether the "defined right" is one of liberty or of life, or both, the foregoing decisions, together with the express guarantees of due process of law of the Fifth and Fourteenth Amendments, give fair warning that a person's right to life is a

---

[10] The jury was instructed that the defendant was charged with depriving the victim of "the right not to be deprived of liberty without due process of law, that is, the right to be free from the use of unreasonable force by one acting under color of law," which is a right "secured by the Constitution and laws of the United States."

protected constitutional right, and that an intentional violation of that right under color of law is proscribed criminal conduct under §§ 241 and 242.

### E. Fair Warning That Conduct Is Under Color of Law

The Supreme Court in *Lanier* dealt only with the "right made specific" element of § 242. *Lanier,* 520 U.S. at 264.[11] It is difficult to conceive of any reason, however, that the Due Process fair warning requirement should not apply also to the "under color of law" element of § 242. Assuming that it does, it also follows that the principles and methodology set forth in *Lanier* for determining whether the requirement was satisfied with respect to a "defined right" may also be applied to decide whether an accused was given fair warning that the charged conduct amounted to acts under color of law before he engaged in that conduct.

Court decisions interpreting the "under color of law" element of § 242 prior to the offenses at issue in these cases gave fair warning to all of the defendants that Len Davis's actions that caused the deprivation of Groves's right to life constituted

---

[11] According to the Court:
> Section 242 is a Reconstruction Era civil rights statute making it criminal to act (1) "willfully" and (2) under color of law (3) to deprive a person of rights protected by the Constitution or laws of the United States. The en banc decision of the Sixth Circuit dealt only with the last of these elements, and it is with that element alone that we are concerned here.

*Id.* (internal citations and footnote omitted).

conduct under color of law.  In *Monroe v. Pape*, 365 U.S. 167 (1961), *overruled in part on other grounds, Monell v. Department of Soc. Servs. of N.Y.,* 436 U.S. 658, 663 (1978), the Supreme Court held that the "under color of" provision of 42 U.S.C. § 1983 applied to unconstitutional actions taken without state authority as well as unconstitutional action authorized by the state.  In that case, the complaint alleged that 13 Chicago police officers: (1) invaded the plaintiffs' home and searched it without a warrant; (2) arrested and detained Mr. Monroe without a warrant and without arraignment; (3) detained him on "open" charges at the police station for 10 hours, interrogated him about a two-day-old murder, and refused to allow him to call an attorney or his family; and (4) subsequently released him without criminal charges being preferred against him.

The Supreme Court in *Monroe* stated and answered the question presented as "whether Congress, in enacting [42 U.S.C. § 1983], meant to give a remedy to parties deprived of constitutional rights, privileges and immunities by an official's abuse of his position. . . .  We conclude that it did so intend." *Monroe,* 365 U.S. at 172.  The Court specifically rejected the argument "that 'under color of' enumerated state authority excludes acts of an official or policeman who can show no authority under state law, state custom, or state usage to do what he did."  *Id.*  The Court noted that, although one of the aims of the statute was "to provide

a federal remedy where the state remedy, though adequate in theory, was not available in practice[,]" *id.* at 174, the legislation has general and independent application regardless of the substance of state laws or the quality of their enforcement.  The Court stated:

> Although the legislation [42 U.S.C. § 1983] was enacted because of the conditions that existed in the South at that time, it is cast in general language and is as applicable to Illinois as it is to the States whose names were mentioned over and again in the debates. It is no answer that the State has a law which if enforced would give relief.  The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked. Hence the fact that Illinois by its constitution and laws outlaws unreasonable searches and seizures is no barrier to the present suit in the federal court.

*Id.* at 183.

Moreover, the Supreme Court in *Monroe* concluded that the meaning given "under color of" law "in the *Classic* case and in the *Screws* and *Williams* Cases was the correct one; and we adhere to it."  *Id.* at 187.  The Court recalled that in *Classic*, it had ruled, "'Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken "under color of" state law.'"  *Id.* at 184 (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). " The right involved in the *Classic* case was the right of voters in a primary to have their votes counted.  The laws of Louisiana required the defendants 'to count the ballots, to record the result

of the count, and to certify the result of the election.'" *Monroe,* 365 U.S. at 183–84 (quoting *Classic*, 313 U.S. at 326). "But according to the indictment they did not perform their duty." *Id.* at 184. The *Monroe* Court further noted that the *Classic* case's view of the meaning of the words "under color of" state law, in 18 U.S.C. § 242, was reaffirmed in *Screws*, 325 U.S. at 108-13; that in *Screws*, the Court had rejected, as it did in *Monroe*, the argument that "under color of" state law included only action taken by officials pursuant to state law; that the Court had adhered to *Classic's* view in *Williams v. United States*, 341 U.S. 70, 99 (1951); that "[t]he meaning which the *Classic* case gave to the phrase 'under color of any law' involved only a construction of the statute. Hence if it states a rule undesirable in its consequences, Congress can change it." *Monroe,* 365 U.S. at 185; that it is beyond doubt that this phrase should be accorded the same construction in both 42 U.S.C. § 1983 and 18 U.S.C. § 242. *Id.;* and that since the *Screws* and *Williams* decisions, Congress had several pieces of civil rights legislation before it, but on none of those occasions was a word of criticism directed to the prior construction given by the Court to the words "under color of" law. *Id.* at 186.

The Supreme Court's opinion in *United States v. Price*, 383 U.S. 797 (1966), contains a short treatise on "under color of law" that contributes to fair warning that Len Davis's conduct was

within the scope of that term, and that private persons, jointly engaged with him in the prohibited action, would be acting "under color" of law for purposes of the statute.  In footnote 7, the Court stated:

> "Under color" of law means the same thing in § 242 that it does in the civil counterpart of § 242, 42 U.S.C. § 1983.  In cases under § 1983, "under color" of law has consistently been treated as the same thing as the "state action" required under the Fourteenth Amendment.  The contrary view in a § 242 context was expressed by the dissenters in *Screws*, and was rejected then, later in *Williams II*, and finally -- in a § 1983 case -- in *Monroe v. Pape*.  Recent decisions of this Court which have given form to the "state action" doctrine make it clear that the indictments in this case allege conduct on the part of the "pr[i]vate" defendants which constitutes "state action," and hence action "under color" of law within § 242.  In *Burton v. Wilmington Parking Authority*, we held that there is "state action" whenever the "State has so far insinuated itself into a position of interdependence (with the otherwise 'private' person whose conduct is said to violate the Fourteenth Amendment) * * * that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment."

*Id.* at 794 n.7 (internal citations omitted).

Several courts of appeals have dealt with the question of when a state law enforcement officer, whose conduct is usually considered to be state action, becomes a private citizen for state action/under color of law purposes.  In *United States v. Tarpley*, 945 F.2d 806 (5th Cir. 1991), involving 18 U.S.C. § 242, the

defendant deputy sheriff was accused of assaulting his wife's former lover under color of law. Affirming his conviction, the Fifth Circuit stated:

> Tarpley did more than simply use his service weapon and identify himself as a police officer. At several points during his assault of Vestal, he claimed to have special authority for his actions by virtue of his official status. He claimed that he could kill Vestal because he was an officer of the law. Significantly, Tarpley summoned another police officer from the sheriff's station and identified him as a fellow officer and ally. The men then proceeded to run Vestal out of town in their squad car. The presence of police and the air of official authority pervaded the entire incident.

*Id.* at 809.

*Stengel v. Belcher*, 522 F.2d 438 (6th Cir. 1975), *cert. granted*, 425 U.S. 910, *cert. dismissed as improvidently granted*, 429 U.S. 118 (1976), dealt with an off-duty, out-of-uniform police officer whose involvement in a bar room brawl resulted in his shooting several and killing two persons. The officer did not identify himself as such when he intervened. On the other hand, police department regulations imposed a continuing duty on police officers, even when off duty, to act in connection with any type of police or criminal activity. Also, the officer used mace issued by the department and a gun, similarly issued by the department, which he was required to carry at all times. The Sixth Circuit indicated that the officer was acting under color of law as a matter of law: "The fact that a police officer is on or off duty, or in or out of

uniform is not controlling. 'It is the nature of the act performed, not the clothing of the actor or even the status of being on duty, or off duty, which determines whether the officer has acted under color of law.'" *Id.* at 441.

In *Revene v. Charles County Commissioners*, 882 F.2d 870 (4th Cir. 1989), an off-duty deputy sheriff shot and killed plaintiff's decedent. The Fourth Circuit reversed the district court's dismissal on state action grounds. Even though the defendant was off duty, out of uniform, and driving his own vehicle, as a matter of local law he was on duty twenty-four hours a day and was expected to take proper police action when appropriate. *Id.* at 873.

Other cases have drawn helpful distinctions: *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) ("The Constitution is a charter of negative liberties; it tells the state to let people alone; it does not require the federal government or the state to provide services, even so elementary a service as maintaining law and order. . . . [However,][i]f the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit."); *Beard v. O'Neal*, 728 F.2d 894, 897 (7th Cir. 1984) ("This case is unlike a situation where a uniformed police officer, who is in a position to prevent violence, observes a murder without

83

intervening in any way. . . . Indeed, the officer's presence and authority might facilitate the murder by providing the symbolic support of the government. In such a case, the officer might be personally liable for the acts of the person who operated the murder weapon.").

Accordingly, an act is under color of law when it constitutes a "'[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Monroe*, 365 U.S. at 184 (quoting *Classic*, 313 U.S. at 326); *Tarpley*, 945 F.2d at 809; *Lanier*, 33 F.3d. at 653. "It is clear that under 'color' of law means under 'pretense' of law." *Screws*, 325 U.S. at 111. *Accord Tarpley,* 945 F.2d at 809; *Lanier,* 33 F.3d at 653. Individuals pursuing private aims but not using or misusing state authority are not acting under color of law purely because they are state officers. See *Tarpley,* 945 F.2d at 809; *Lanier,* 33 F.3d at 653. However,"[a]cts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it." *Screws*, 325 U.S. at 111. *Screws* does not "mean that if officials act for purely personal reasons, they necessarily fail to act 'under color of law.'" *Tarpley*, 945 F.2d at 809 (citing *Brown v. Miller*, 631 F.2d 408 (5th Cir. 1980); *United States v. Davila*, 704 F.2d 749 (5th Cir. 1983)).

Consequently, Davis, Hardy, and Causey had adequate advance

notice that their actions were not merely part of Davis's pursuit of a purely personal goal, but also involved a substantial use or misuse of the authority and power vested in him by state law: (1) Davis's actions were taken to protect his position as a police officer, to retaliate against Groves for informing the IAD of his alleged previous acts under color of law in misuse of his authority, and to send the IAD a message to leave him alone in his exercise of the powers of his office; (2) While acting under the pretense of performing his official duties, Davis used the police station, police squad car, police radio, and police telephone, as well as his presence as a fully armed and equipped, uniformed policeman, driving a marked police squad car, to plan, direct, and effectuate the murder of Groves; (3) Davis had the power as a police officer to either protect or not protect Hardy and Causey from investigation and arrest for numerous crimes; Davis used this power vested in him by the state to persuade and require Hardy and Causey to murder Groves; (4) Davis used his authority and the power of his office to provide, on his own watch, surveillance, lookout, and cover for the killers under which they began and carried out most of the homicide operation; (5) After setting the murder scheme in motion, Davis continued to misuse his authority and responsibility by deliberately allowing the criminal activity to proceed unimpeded, contrary to his obligation as a police officer, whether on duty or off, to interdict known breaches of the peace; (6) Hardy and Causey joined and executed the murder operation with

full knowledge and consent to the foregoing facts.

It is true that, unlike the present case, most of the previous decisions upholding convictions under §§ 241 and 242, and civil judgments under § 1983, for unconstitutional deprivations of life and liberty by law enforcement officers involved the officer's personal operation of the weapon or other criminal means. There is no reason in law, common sense, or morality, however, for any rational person, whether he is a police officer or a co-participant in an offense with the officer, to believe that the deprivation of a person's constitutional right to life by an officer's use and misuse of his authority through an intermediary would not be equally as unlawful as such a deprivation by the officer's own hand. The Supreme Court has "upheld convictions under § 241 or § 242 despite notable factual distinctions between the precedents relied on and the cases then before the court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Lanier*, 520 U.S. at 269 (citing authorities). "In sum, as with civil liability under § 1983 or *Bivens*, all that can usefully be said about criminal liability under § 242 is that it may be imposed for deprivation of a constitutional right if, but only if, 'in the light of pre-existing law the unlawfulness [under the Constitution] is apparent[.]' Where it is, the constitutional requirement of fair warning is

satisfied." *Id.* at 271-72 (internal citation omitted).[12]

_____

[12] There are other §§ 241 and 242 cases involving facts similar to Len Davis's "rogue cop" conduct in which, apparently, the "color of law" and "right protected" elements were so clear that these issues were not raised as assignments of error in either case.

In *United States v. Robinson,* 503 F.2d 208 (7th Cir. 1974), *cert. denied,* 420 U.S. 949 (1975), the Seventh Circuit affirmed the §§ 241 and 242 criminal convictions of a police officer who conspired with lay-person accomplices to murder drug dealers in order to finance a scheme to rob an armored car.

In *Robinson,* one indictment charged two Chicago police officers with conspiring with others to "deprive citizens of their rights to life, liberty, and property without due process of law, and that the operation of the conspiracy resulted in the deaths of Jeff Beard and Verdell Smith, in violation of 18 U.S.C. § 241"; and two counts charged Robinson, while acting under color of law, with depriving Joseph Rubio and Jeff Beard of "constitutional rights and protections" in violation of 18 U.S.C. § 242. *Id.* at 210.

Police officer Robinson entered into a conspiracy with Holmes and O'Neal (an undercover paid FBI informant) to "shake down" drug pushers in order to finance what was called a "milkrun," which was a scheme to rob $1 million from an armored car. *Id.* at 211. As part of the conspiracy, Officer Robinson obtained a contract to murder Chuck McFerren, a witness in a state murder trial, with the money to be used to fund the "milkrun." *Id.* After Robinson, Tolliver (a second police officer who was acquitted), Holmes, and O'Neal staked out the lounge owned by McFerren, they followed McFerren in Robinson's car. When they pulled up next to McFerren's car, Officer Tolliver fired a rifle through the rear window of the vehicle, killing Verdell Smith, a passenger in the car. *Id.*

Nine days later, Officer Robinson obtained a $5,000 murder contract on Joe Rubio, a reputed narcotics pusher. *Id.* at 211-12. Officer Robinson, O'Neal, and a third conspirator, Bruce, stopped Rubio's car. Robinson and Bruce handcuffed Rubio's hands behind his back, put him in the back seat of O'Neal's car, and drove him to a public park forest. *Id.* at 212. Instead of killing Rubio, Robinson "shook him down," getting Rubio to pay each conspirator $100 and agree to sell narcotics for them. *Id.*

Two days later, Officer Robinson told O'Neal that he had a $1,000 "contract" to murder Jeff Beard, another narcotics dealer. *Id.* Robinson and O'Neal spotted Beard at a pool hall, and Robinson accosted him when he left. Robinson told Beard that he had a warrant and that he was going to take Beard to the police station. *Id.* Robinson searched Beard, handcuffed him, and placed him in the back of a car driven by O'Neal. *Id.* Robinson and O'Neal drove Beard to Indiana, where Robinson shot and clubbed Beard to death.

Applying the fair warning standard, principles, and methodology clarified by the Supreme Court in *Lanier*, by analogy, I conclude that each of the defendants in the present cases was given fair warning by prior decisions that the conduct he intentionally chose to engage in would amount to acts under color of law and subject him to criminal liability under 18 U.S.C. § 242.

## II.  Effect of Erroneous Conviction of Witness Tampering

I agree that the witness tampering conviction must be reversed and the case remanded for resentencing.

I write further only to add authorities that tend to support the majority opinion's conclusion that "[b]ecause it is impossible to say that the jury's penalty phase recommendations of the death penalty were not influenced by the fact that Davis and Hardy had received three death eligible convictions, rather than two, we must vacate the death sentences and remand for new sentencing hearings."

This court has declared that "unless it can be ascertained from the record that a trial court's sentence on a valid conviction was not affected by a subsequently invalidated conviction on another count of the indictment, a defendant must be resentenced on the valid conviction." *Bourgeois v. Whitley,* 784 F.2d 718, 721 (5th Cir. 1986). *See also Jerkins v. United States,* 530 F.2d 1203,

---

*Id.*

1204 (5th Cir. 1976); *United States v. Garcia,* 821 F.2d 1051, 1053 (1987) (citing *United States v. Tucker,* 404 U.S. 443 (1972)).

In capital cases, "[e]volving standards of societal decency have imposed a correspondingly high requirement of reliability on the determination that death is the appropriate penalty in a particular case." *Mills v. Maryland,* 486 U.S. 367, 383-84 (1988). Therefore, "[t]he possibility that [defendant's] jury conducted its task improperly certainly is great enough to require resentencing." *Id.* at 384 (emphasis added). Furthermore, "'[t]he risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty . . . is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.'" *Id.* at 376-77 (quoting *Lockett v. Ohio,* 438 U.S. 586, 605 (1978)).

In this case, defendants Davis, Hardy, and Causey were charged with three counts alleging violations of: (1) 18 U.S.C. § 241, "Conspiracy against rights"; (2) 18 U.S.C. § 242, "Deprivation of rights under color of law"; and (3) 18 U.S.C. § 1512, "Tampering with a witness, victim, or an informant." Conviction on each of these counts is punishable by the death penalty. While the government filed a "Notice of Intent to Seek the Death Penalty" for each of the three counts with respect to Davis and Hardy, the government did not seek the death penalty with respect to Causey. Davis and Hardy were convicted on all three counts; Causey was convicted on counts one and two, and the jury was unable to render

a unanimous verdict with respect to Causey on count three, which subsequently was dismissed without prejudice.

"There is, of course, no extrinsic evidence of what the jury in this case actually thought. We have before us only the verdict form and the judge's instructions." *Mills,* 486 U.S. at 381. However, my reading of those parts of the record leads me "to conclude that there is at least a substantial risk that the jury was misinformed." *Id.*

During each of the separate penalty phases of Davis and Hardy, the jury was instructed that it "must consider any mitigating factors that may be present in this case." The jury was permitted to consider "*anything* about the commission of the crime or about [the defendant's] background or character that would mitigate against the imposition of the death penalty." Specifically, the jury was told that the defendant relied upon the mitigating factor "that <u>another person, equally culpable in the crime will not be punished by death</u>." (emphasis added) This instruction permitted the jury to take into account as a reason not to impose the death penalty the fact -- if the juror found it to be so by the preponderance of the evidence -- that other participants in the killing would not be sentenced to death and executed, even though they might be equally or even more responsible than the defendant for the victim's death. According to the jury instructions, "[t]he law requires consideration of this mitigating factor to allow

juries to consider what is fair, considering all of the persons responsible for an intentional killing, before imposing a sentence of death." Significantly, however, the jury also was instructed that "[i]f even one juror finds a mitigating factor present which, in that juror's mind, is not outweighed beyond a reasonable doubt by the aggravating factors proved, then the jury may not sentence Hardy to death." (emphasis added).

This panel has decided to reverse the convictions of Davis and Hardy on count three, for lack of sufficient evidence, and to affirm Causey's convictions on counts one and two. Therefore, all three defendants will stand convicted of only counts one and two. However, Davis and Hardy have been sentenced to death, while Causey has been sentenced to life imprisonment.

Given this disposition of the defendants' appeals, we cannot rule out the substantial possibility that, during the death penalty deliberations with respect to Davis and Hardy, had the jury been presented with the circumstances as they now exist, i.e., all three defendants standing convicted on counts one and two, but not count three, and only Causey having been spared from the death penalty, that one or more jurors would have found by a preponderance of the evidence with respect to Davis and Hardy that "another defendant or defendants, equally culpable in the crime, [namely, Damon Causey, would] not be punished by death." If even one juror had found this mitigating factor to be present in the penalty phase of either Davis or Hardy, or both, and had further found the mitigation not

to be outweighed beyond a reasonable doubt by the aggravating factors proved, then the jury could not have sentenced the defendant to death in any penalty phase in which a single juror was so influenced by the mitigating factor. "'Because the [sentencer's] failure to consider all of the mitigating evidence risks erroneous imposition of the death sentence,'" this case must be remanded for resentencing. *See Mills,* 486 U.S. at 375 (quoting *Eddings v. Oklahoma,* 455 U.S. 104, 117 (1982) (O'Connor, J., concurring)).

### III. Conclusion

I join in the majority opinion for the reasons expressed therein and for the additional reasons herein assigned.